Alphonse LEWIS, Jr., Plaintiff,

v.

CITY OF GRAND RAPIDS, MICHIGAN, Michigan Liquor Control Commission, William A. Johnson, Superintendent of Grand Rapids Police Department, William H. Nichols, Jr., Trustee of the Estate of Patricia Ettress Bell, Bankrupt, United States of America, their commissioners, officials, officers, attorneys, agents, employees, and any others acting for, with or in concert with any of them, Defendants.

No. 4431.

United States District Court
W. D. Michigan, S. D.

Sept. 13, 1963.

Alphonse Lewis, Jr., Grand Rapids, Mich., for plaintiff.

William J. Garlington, City Atty., and Wendell Miles, of Dutchess, Mika, Miles, Meyers, Merdzinski & Snow, Grand Rapids,. Mich., for defendants City of Grand Rapids and William A. Johnson.

Murray B. DeGroot, Grand Rapids, Mich., for defendant William H. Nichols, Jr., Trustee.

James Saunders, Asst. Atty. Gen., Lincoln Park, Mich., for defendant Mich. Liquor Control Commission.

FOX, District Judge.

This action involves the denial of a transfer and ultimate revocation by the Chief of Police and the City Commission of Grand Rapids of the only negro-owned-operated Class C liquor license in a city of over 200,000 population.

Plaintiff Alphonse Lewis, Jr., a negro, claims the refusal to transfer the license of Barnett's Bar fom Patricia Ettress Bell, a negro, to him and Dr. Cortez English, a negro, denied him his constitutionally protected rights of due process and equal protection of the law guaranteed by the Fourteenth Amendment of the Constitution of the United States.

Plaintiff further claims that William A. Johnson and certain City Commissioners conspired to delay and deny the transfer of the Class C license of Barnett's Bar to him in violation of the Federal Civil Rights Act of 1883.

The case was introduced first into the Federal District Court for the Western District of Michigan, Southern Division, in a voluntary bankruptcy proceeding by Patricia Ettress Bell, In the Matter of Patricia Ettress Bell, Bankrupt, In Bankruptcy No. 21,695–B.

The Bankruptcy Court issued restraining orders against the City of Grand Rapids and designated city officials, restraining them from taking any action which would adversely affect the claimed ownership by the Trustee of the license at Barnett's Bar.

Plaintiff Lewis commenced this action to secure his constitutionally protected rights, and to restrain the City of Grand Rapids and its designated officials from interfering with these constitutional rights.

To better understand this case, the Court presents a chronology of events adduced by the evidence.

Barnett's Bar and Lounge was owned and operated by Stanley Barnett until his death in 1946. The Bar was then operated by Stanley Barnett, Jr., as administrator, until his death in 1948.

Menso R. Bolt and Alphonse Lewis, Jr. operated the Bar thereafter as successor administrators of the Stanley Barnett estate. In 1952 the ownership of the Bar was transferred to Patricia Ettress, the minor daughter of Stanley Barnett, Jr.

During the minorship of Patricia Ettress, the Bar was operated by her mother, Louise Baldwin, and by her stepfather, Jesse Baldwin. Their agreement to purchase the bar from Patricia Ettress was never executed.

The Bar was closed for a period in 1958 and 1959, and was reopened in May of 1959. It is the judgment of this court that Patricia Ettress Bell found it difficult to finance the Bar's reopening and operation in May of 1959. She had to look ultimately to Mr. Lewis for the necessary finances.

In preparation for reopening the Bar, Patricia Ettress secured a loan of $3,000 from Alphonse Lewis, Jr., by executing a chattel mortgage to him covering "all licenses, all furniture, furnishings and equipment" in the Bar.

On May 15, 1959, the Grand Rapids Police filed their report with the Michigan Liquor Control Commission (hereinafter referred to as the "LCC"), approving Alphonse Lewis, Jr. as manager of Barnett's Bar and Lounge.

On May 20, 1959, Patricia Ettress and Alphonse Lewis, Jr. entered into a managerial agreement whereby Mr. Lewis was to manage the Bar, exercise certain concomitant powers, and receive a specified remuneration for his services. The managerial agreement was drawn up at the suggestion and with the approval of the LCC and made a part of its public files.

No further incidents involving official action occurred until August 1960. At that time, a negro police officer for Grand Rapids, in the course of his duties, became suspicious of gambling activities in the basement of the building in which the Bar was located. He was convinced that Mr. Lewis, as manager, did not know of these activities and so informed Chief Johnson. This officer reported his suspicions to Superintendent of Police William Johnson. Chief Johnson then employed a Saginaw police officer, Sylvester Stephens, to investigate.

Officer Stephens frequented the Bar for the full first week of August. He turned over his information to the Grand Rapids Police, and this body raided the building some time in the early part of August.

On August 11, 1960, a violation report was filed with the LCC against Patricia Ettress, charging that gambling had been discovered on the premises of Barnett's Bar and Lounge.

About the same time, Patricia Ettress entered into an agreement to sell the license to one Frank Reynolds. The check tendered Mrs. Ettress by Mr. Reynolds turned out to be no good and the transfer was later cancelled.

On September 26, 1960, the Grand Rapids Police called the LCC and requested that any Commission hearings on the alleged gambling violation be postponed until the Police Court action was completed in Grand Rapids. A letter dated September 27, 1960 followed, explaining that to divulge information to the LCC at that time would seriously weaken the cases in Police Court, and thus, a postponement was desired.

Mr. Baldwin and Mr. Coogan attempted to purchase the Bar and license in October 1960. This application for transfer was withdrawn.

On November 10, 1960, Patricia Ettress entered into an agreement to sell the Bar and license to Dr. Cortez English. The agreement was drafted by Alphonse Lewis in his office. This transfer was to be contingent upon the Reynolds transfer not going through. Papers were not filed on this application with the LCC until March of 1961, after Mr. Reynolds rescinded his agreement.

From December 9, 1960 to March 8, 1961, there were a series of communications between the LCC and the Grand Rapids Police concerning the status of the Police Court action on the gambling charges. The LCC was informed of a number of adjournments.

On March 6, 1961, formal applications for transfer were filed with the LCC by Dr. English and Mr. Lewis, as transferees, and Patricia Ettress, as transferor. These are the applications under consideration by all parties throughout this suit.

May 10, 1961, Patricia Ettress wrote a letter to Mr. Lewis terminating his position as manager of the Bar.

In May 1961, a Police Court hearing was held on the gambling charges. At that time four of the six parties charged were dismissed. Two of the parties were bound over to Superior Court.

On May 15, 1961, Mr. Lewis was added as a party to the November agreement to sell between Patricia Ettress and Dr. English. The amendment provided that Mr. Lewis would be a co-purchaser and

partner with Dr. English. This apparently was verbally understood on March 6, 1961, when the parties filed their application for transfer.

On May 29, 1961, Mr. Lewis submitted to Patricia Ettress an itemized statement for $16,596.15 for loans and services rendered.

The LCC on June 2, 1961, asked both the Grand Rapids City Commission and the Grand Rapids Police to make their investigations of the pending transfer to Dr. English and Mr. Lewis. The letter to the Grand Rapids Police specifically stated that if the parties were not recommended for transfer, reasons should be given.

The same day, Inspector Andrew J. Spyk, Jr., of the Allegan enforcement staff for the LCC, filed his investigation report with the LCC. In it he recommended the transfer be made, subject to the receipt of a birth certificate for Dr. English.

The investigation report shows that the established purchase price was to be $18,000, plus the cost of inventory, $400. The applicants were to invest $18,400 in the purchase in the following manner, according to Mr. Spyk's report:

$16,596.15—the amount which the licensee, Mrs. Ettress, owed to Mr. Lewis for back salary as manager, for money advanced, and for services rendered as her attorney; $1,920—money advanced to the licensee by Dr. English for sales tax payments, license renewal and payments on account with the Internal Revenue Department.

These two figures total $18,516.15, and Mr. Spyk's investigation report comments: "This is the amount which the licensee owes the applicants and will be paid in lieu of cash. Statements are attached".

The report goes on to show that the books and records of the Bar were carefully scrutinized and the Investigator recognized that there were tax liens against the present licensee. From the investigation, Mr. Spyk stated that he was of the opinion that the licensee, Mrs. Ettress, was the true owner.

Besides commenting that there was a violation pending against this establishment, the report shows that there existed also at that time a Department of Revenue stop against this license.

The Grand Rapids Police filed their investigation form 1800 with the LCC on July 11, 1961. The transfer was not recommended according to this form because of the pending gambling violations. The reasons for not recommending were set out on the back of the form. The reasons included a statement that Mr. Lewis was manager of the Bar at the time the raid took place.

Consequently, on August 7, 1961, the LCC denied the transfer due to failure to receive a favorable recommendation from the Police Department.

On August 21, 1961, Mr. Lewis requested an LCC hearing on the denial of the transfer claiming that the pending violation did not involve the licensee or himself. None of the parties charged in the Police Court action were parties to this transfer. In his letter, Mr. Lewis also pointed out that the transfer application had not yet come before the City Safety Committee.

August 23, 1961, agents of the Michigan Department of Revenue, armed with a warrant, attempted to close Barnett's Bar due to delinquent sales taxes. However, an agreement was entered into whereby the Department of Revenue would not close the Bar if $500 were paid that day on the delinquent taxes and if Patricia Ettress turned over all the management to Mr. Lewis. This was confirmed by a letter from the Michigan Department of Revenue to Mr. Lewis dated August 25, 1961.

The $500 was paid by Mr. Lewis, and Mrs. Ettress agreed to let him manage the Bar. From August 23, 1961 to September 21, 1961, Mr. Lewis operated the Bar as manager under this verbal agreement.

The Department became dissatisfied with the arrangement for paying the delinquent taxes, and wrote a letter to Mr. Lewis on September 12, 1961, emphasiz-

ing the need for weekly payments. It was pointed out that the Bar was open only at the grace of the Department of Revenue and that they were confident that Mr. Lewis would clear up the problem.

While negotiations were still going on concerning the State's sales taxes, the Bar was closed by the federal authorities on September 26, 1961, for delinquent federal taxes.

In October, the federal authorities held a public tax sale of the personal property at the Bar. The sale was made to Jesse Baldwin; however, he could not come up with the money and a new sale was noticed.

During October an attempt was made by Mr. Lewis and the federal agent, Mr. Forell, to have the Grand Rapids Police complete the investigation on the transfer and send the 1800 form to the LCC.

In answer to a letter of October 6, 1961, from the LCC, Officer Charles P. Skuzinski of the Grand Rapids Police, on October 11, 1961, reported that defendants Daniel Bethea and Wayne Wofford pleaded guilty to the gambling charges filed in August of 1960 in the Superior Court for the City of Grand Rapids, Case No. 20097.

This report was false, and the events in regard to the gambling charges were as follows:

In May of 1961, an examination was held in the Police Court for the City of Grand Rapids. As that time the case against four defendants, including Wesley Calloway, was dismissed.

Two of the defendants, Daniel Bethea and Wayne Wofford, in Case No. 20097, were bound over to the Superior Court for the City of Grand Rapids.

After the police court hearing, a new warrant was issued against Wesley Calloway, owner of part of the building in which Barnett's Bar was located, charging him with possession of gambling paraphernalia. On June 12, he was arraigned in the Superior Court for the City of Grand Rapids and stood mute.

On October 2, 1961, he entered a plea of guilty.

On October 11, 1961, Louis John Educato, deputy prosecuting attorney, petitioned the Superior Court for an order nolle prosequi against Daniel Bethea and Wayne Wofford, and the order nolle prosequi was entered pursuant to the petition on October 11, 1961.

All cases concerning Barnett's Bar, except the violation hearing pending before the LCC had been at this time closed, either by dismissal by the magistrate, or a nolle prosequi order in the Superior Court. The case in which Wesley Calloway pleaded guilty did not involve a violation of the gambling laws at Barnett's Bar.

On October 13, 1961, after dismissal of the charges, the LCC promptly sent the 1800 investigation forms to the Grand Rapids Police Department for its investigation in the transfer matter.

Mr. Lewis directed a letter to the LCC on October 16, 1961, requesting a speedy hearing on the gambling violation filed with the LCC. The letter contains a statement to the effect that the transfer is desired soon so that the sales taxes can be paid in full.

On October 18, 1961, a new management agreement was entered into between Patricia Ettress and Alphonse Lewis, Jr., giving him broad powers in regard to the operation of the Bar.

October 21, 1961, Mrs. Ettress wrote to the LCC raising a question with regard to the proposed sale price of the license to Dr. English and Mr. Lewis. She wanted the purchase to pay all her debts.

The alleged gambling violation was heard by Kenneth J. Daniels, Commissioner of the LCC, on October 31, 1961. At this hearing, Mrs. Ettress was represented by Alphonse Lewis, Jr. At the close of the hearing that day, Commissioner Daniels stated:

"Well, in regards to the second count, Counselor, unlawfully permit on the licensed premises, gaming or gambling, to wit: accepting of

and/or placing of mutuel bet slips on August 5th, there is no testimony offered that any bet was made on that date, whatsoever. There was an attempt which was denied. I shall dismiss that. There is no evidence of any gambling devices or paraphernalia, mutuel bet slips, on the date of August 5th. I'm going to dismiss that, but I want to say this, Mrs. Ettress—there is no doubt in my mind there has been some gambling activities in your bar with the knowledge of your bartender, and the bartender's name slips me now, I believe Dan—he certainly had knowledge of what was going on. This is not permissible. I'm glad you're going out of the business and I understand you're going on?

"MR. LEWIS: Yes.

"COMMISSIONER DANIELS: I'm sure you'll be able to curtail the activities. If you're going to use the basement, I would suggest you partition a part of it off to use. I'll dismiss the charges against you here today, sir. That will be all."

An order was entered that day dismissing the charges.

Accordingly, on October 31, 1961, all matters concerning the alleged gambling violation had been disposed of, including the violation hearing before the LCC. From this date forward, there were no gambling charges against Barnett's Bar.

According to the police investigation form 1800, the police investigation was made November 1, 1961. The form shows that recommendation for transfer was changed from "yes" to "no." It also says, "subject to final inspection," and points out that the parties intend to redecorate. No reasons were ever listed for the negative recommendation. None could be listed at that time, since the 1800 form had an affirmative recommendation until some time after July 31, 1962. The report was signed by Officer Skuzinski.

On November 1, 1961, Mr. Arens, LCC enforcement officer for Section 3, Alle-

gan office, wrote to the LCC stating that Officer Edward Szumski of the Grand Rapids Police requested a transcript of the hearing before Commissioner Daniels.

Some time in November, Mr. Lewis learned that a copy of the police investigation form 1800 had not yet been filed with the City Clerk. He and the federal agent again visited the police department to ascertain the status of the investigation. At that time they were told that the police were awaiting the transcript from the LCC on the hearing.

On November 13, 1961, Mr. Lewis as chattel mortgagee, purchased the personal property of the bar at the second federal tax sale.

On June 20, 1961, Andrew J. Spyk, Jr., investigator for the LCC, filed his report, in which he referred to the financial arrangement between the parties and stated that the investigation for the license transfer was complete. He called the gambling violations to the attention of the LCC.

On November 13, 1961, Mrs. Ettress sent the license to the LCC and asked that it be held in escrow. She stated that she considered the application of Dr. English and Mr. Lewis void.

December 5, 1961, Mrs. Ettress again wrote the LCC asking if the business could be run on a trustee or receivership basis. The transfer to Mr. Lewis and Dr. English would be agreeable if the price covered all her debts. She requested that the license be removed from escrow and that Mr. Lewis be appointed Trustee to operate the Bar according to the terms declared by the Commission. She then requested reinstatement of the applications for transfer to Dr. English and Mr. Lewis.

On December 5, 1961, the Grand Rapids Police Department received the transcript of the hearing before the LCC.

December 14, 1961, Mrs. Ettress appeared in the police department offices and talked with Officer Szumski. She was accompanied by Wesley Calloway.

At that time Officer Szumski took her statement to the effect that she did not want to transfer the license and receive in return a cancellation of her debt to Mr. Lewis. But she said she would favor a transfer if provision was made to pay all her debts.

December 15, 1961, a general power of attorney in favor of Mr. Lewis for Mrs. Ettress was filed with the LCC.

Mr. Lewis again approached the police department concerning their investigation. He talked to Officer Szumski in his office about completion of the 1800 form. Officer Szumski advised Mr. Lewis that the Chief of Police had said to "sit on" that form. Officer Szumski pointed to a drawer in his desk and said: "It's right in there and that's where it is going to stay".

Confusion was added at this time when Mr. Lewis learned that the LCC supposedly had called off the investigation. After Mr. Lewis found that the investigation was to continue, he was told by Chief Johnson that Mrs. Ettress did not want to transfer and, therefore, nothing had to be done.

December 19, 1961, five days after her statement to the police, Mrs. Ettress informed LCC enforcement supervisor, Mr. Arens, that she was not interested in transferring to Mr. Lewis and Dr. English, but that she would transfer to a Mr. Eaddy. The same day Patricia Ettress wrote the LCC asking to cancel the transfer to Mr. Lewis and Dr. English, and predicting the transfer to Mr. Eaddy.

The transferees, Mr. Lewis and Dr. English, then filed a suit in the Circuit Court of Kent County for specific performance, asking that Mrs. Ettress be ordered to perform the transfer agreement entered into November 20, 1960, and amended May 15, 1961. Included in this action was a request by the plaintiffs that Mr. Lewis be appointed receiver to run and operate the Bar. At a show cause hearing, Circuit Judge Fred N. Searl refused to appoint Mr. Lewis as receiver. Mrs. Ettress was represented at this time by Mr. Roger Boer.

There is a law in Michigan which holds that an action for appointment of a receiver is necessarily ancillary to some other court action, and that an interested party cannot be appointed receiver. See, e. g., Merchants' & Manuf'rs' Natl. Bank of Detroit v. Kent Circuit Judge, 43 Mich. 292, 5 N.W. 627.

After this hearing, Mr. Boer withdrew from the case and Mr. Charles Dewey continued to represent Mrs. Ettress.

On January 3, 1962, Mr. Lewis sent to the law office of Newton Dilley, who employed Mr. Dewey, personal property tax returns for Mrs. Ettress.

January 11, 1962, Mr. Lewis directed a letter to the City Clerk requesting a hearing before the Safety Committee on this transfer.

On January 16, 1962, a meeting was held by the Safety Committee, at which the Barnett's Bar license transfer was discussed for the first time. At that time, one of the members of the Safety Committee was a local attorney, Mr. Berton Sevensma. When he learned that there was a Kent County Circuit Court case pending in this matter, it was moved that the hearing be adjourned in order that Mr. Sevensma might investigate the status of the court case and report back to the Committee.

On January 24, 1962, the LCC wrote Mrs. Ettress, approving her request for escrow of the license, and stated that the license would be so held until April 30, 1962, pending transfer.

On March 20, 1962, while the hearings before the Safety Committee were pending, the Circuit Court case between Mr. Lewis and Mrs. Ettress, filed December 21, 1961, was settled. According to the settlement agreement, Mrs. Ettress agreed to transfer the license to Mr. Lewis and Dr. English. It was agreed that Mr. Lewis would act as receiver for the operation of the Bar during pendency of the proceedings for transfer. He has acted in this position to date.

In addition to the cancellation of the $16,596.15 owed by Patricia Ettress to

Alphonse Lewis, Mr. Lewis by this agreement was to assume and pay debts not to exceed $7,100 claimed to be due Dr. English, Taylor O'Harris, Decker, Davis & Jean, Mackey Insurance Agency, Arthur Kramer or Dorothy Kramer, doing business as Kent Bookkeeping Service; personal property taxes to the City of Grand Rapids, personal property taxes to the County of Kent, Michigan Department of Revenue taxes, including, but not limited to, sales and business activities taxes; Internal Revenue Department for taxes, including, but not limited to, 1959, 1960 and 1961 withholding, personal income taxes and 1959 excise taxes; $1,700 for attorney fees to the law firm of Rom & Newton Dilley; and to save Patricia Ettress harmless on all claims and obligations of Fred W. Poel, Rosalind Bolt Larson, the heirs and assignees of the estate of Menso R. Bolt, and from any claim of Arnold Levandoski, his estate, or his heirs or assigns.

This settlement agreement is plaintiff's Exhibit 50, and it is attached to this opinion as Appendix 1.

The same day a request was filed by Mrs. Ettress in the Circuit Court asking that the LCC, Grand Rapids Police Department, and Grand Rapids City Commission process and approve the transfer to Dr. English and Mr. Lewis and served notice that Mrs. Ettress withdrew her previous objections to the transfer.

March 21, 1962, Mr. Lewis delivered a copy of this request to Chief Johnson and to the City Clerk, the unofficial secretary for the Safety Committee, and to the LCC. Chief Johnson asked Mr. Lewis if there would not be another investigation, and Mr. Lewis replied that none was needed; one had already been made.

March 22, 1962, City Treasurer, Mr. Simon DeBoer, sent a list headed, "To Whom It May Concern", listing the personal property taxes due on Barnett's Bar and Lounge for the years 1959–1961, as $713.78.[1]

On March 27, the Safety Committee held another hearing at which this transfer was discussed. The settlement was given to the Committee. Commissioner Sevensma stated that he had examined the Circuit Court file and that the case had not yet been formally dismissed. Mr. Lewis replied that the case would not be dismissed according to the terms of the agreement until transfer had been completed. Commissioner Lamberts testified that the request for approval of the transfer by Mrs. Ettress and her attorney, Mr. Dewey, was before the Committee at this time. The hearing was adjourned without further action.

By the settlement Lewis agreed to pay all the taxes owed to the City of Grand Rapids, Kent County, the State of Michigan and the United States due from Patricia Ettress [resulting] from operation of Barnett's Bar.

On March 27, the transfer proceedings were in that condition from which the license could be transferred to Mr. Lewis and Dr. English, subject to payment of taxes by Mr. Lewis in accordance with this agreement. The differences between Mr. Lewis and Patricia Ettress were resolved under Circuit Court Action No. 65570, in which Patricia Ettress was represented by independent, competent, and reputable counsel.

The Safety Committee, Commissioners Lamberts, Sevensma and Barto, were fully advised by this settlement agreement of the fact that Patricia Ettress was the licensee and that Mr. Lewis was operating the Bar as receiver pending approval and transfer of the license to him and Dr. English.

March 29, Mrs. Ettress executed an assignment of all right, title, and interest in her Class C license to Mr. Lewis, subject to the approval of the LCC. This apparently is a standard procedure pending the transfer of any license, since the assignment is made upon a form provided by the LCC.

1. This list was requested by some person or persons whose names were not disclosed at the trial.

The same day Mrs. Ettress appointed Mr. Lewis as her attorney to operate, run, and supervise the license at Barnett's Bar. This power of attorney was to be revoked upon the transfer of the license with the approval of the LCC.

The following day, Mrs. Ettress and Mr. Lewis executed an agreement to the effect that the power of attorney did not affect the settlement agreement entered into on March 20, 1962.

All these instruments were filed with the LCC.

After receiving these settlement documents, the LCC through Mr. Edward F. Maloney, Director of the License Division, promptly sent a letter dated April 6, 1962, "Att: Chief of Police, Grand Rapids Police Department, Grand Rapids, Michigan"—advising the Chief of Police that, "We understand the violations and tax difficulties have all been resolved". And, "The 1961 license has been returned to the location where it is being operated under a power of attorney issued by the licensee".

Thus, the LCC promptly advised the Chief of Police that the Bar was reopened. The letter continued:

"It is respectfully requested we be furnished the 1800 forms with whatever recommendation the Police Department intends, in order that we may clear up this matter as soon as possible.

"We have a copy of notice No. 65570, in which the licensee, Patricia Ettress, requests the local authorities in Grand Rapids to permit the transfer of the license."

The letter also stated that the case had been complex and reminded Chief Johnson that the 1800 forms were sent to him on October 13, 1961. (See Appendix II.)

Immediately after receipt of the April 6 letter from the LCC, Chief Johnson tried again to close Barnett's Bar. With this purpose in mind, he called City Treasurer DeBoer and asked him if he had authority to close the Bar for delinquent city taxes. Mr. DeBoer informed Chief Johnson that he did not have this authority.

Failing in his efforts with Mr. DeBoer, Chief Johnson turned to Mr. Gordon Forell, local internal revenue service officer. Chief Johnson and Officer Szumski solicited the letter of April 12, 1962, plaintiff's Exhibit 7(A) (Appendix III). This in spite of the fact that Chief Johnson and the Safety Committee members were informed that by the settlement of March 20, 1962, Alphonse Lewis agreed to pay all unpaid city taxes, as well as the federal taxes referred to in the April 12, 1962 letter from Mr. Forell.

Chief Johnson was determined to keep the only negro-owned Class C liquor establishment closed. Both Chief Johnson and Commissioner Lamberts testified to many meetings in which they discussed the case of Alphonse Lewis and Barnett's Bar. Commissioner Lamberts joined Chief Johnson in his efforts to close again Barnett's Bar.

The next Safety Committee meeting was held on April 17, 1962. The Committee discussed the transfer. Present were Commissioners Barto, Lamberts, and Sevensma; Police Chief Johnson; Mr. Lewis; the City Clerk, Mr. Stanton Kilpatrick, and his secretary.

The letter to the Grand Rapids Police from Mr. Forell was presented, whereby the police were asked to cooperate in a stop order. This letter took Mr. Lewis by surprise, since he and Mr. Forell had worked together on getting the transfer culminated and had made visits together to the police.

When the Committee discussed the efforts of the City Manager, George Bean, to assist in this transfer, Mr. Lewis claimed that Mr. Bean had been told by the police that the investigation would be completed in a day or two. Chief Johnson claimed that was not what Mr. Bean had been told.

Mr. Lewis, who had asked Mr. Bean to investigate the delay by the Police Department in completing the 1800 form, said that Chief Johnson was lying in regard to Mr. Bean's action—and may

have called Chief Johnson a liar. The Committee then insisted that Mr. Bean be called to clear up this conflict.

The testimony is in conflict as to whether Mr. Bean's statement before the Committee supported Mr. Lewis or Chief Johnson. Commissioner Lamberts testified, however, that Mr. Bean was never told just what Mr. Lewis's position was. She finally went to Mr. Bean after the meeting and discussed this matter in detail.

The City Clerk's minutes of this hearing show that Chief Johnson read two letters to the Safety Committee. The first was a letter dated April 10, 1962 from the LCC to Dr. English, asking whether the license was to be transferred to Dr. English alone, or to Dr. English and to Mr. Lewis as partners. The LCC was confused by the request for transfer filed March 20, 1962 by Mrs. Ettress which said she withdrew her objections to transferring the license to Alphonse Lewis "or" Dr. English.

The second letter read to the Safety Committee was the Forell federal stop-order letter of April 12 which Chief Johnson had solicited. The minutes do not show that the April 6 letter from the LCC to Chief Johnson was introduced, which on its face would have overcome Chief Johnson's objections to the transfer.

Armed with the Forell letter and the April 10 letter, Chief Johnson sought to delay the transfer of this license.

By this time, it seems that at least Commissioner Barto was aware that the stop-order letter of April 12, 1962 had been requested by an officer in the Police Department. He was also aware that Chief Johnson had called City Treasurer DeBoer to see if he could close the Bar. Commissioner Barto testified that in a discussion with Chief Johnson outside the meeting, Chief Johnson told Barto that the reason he did not act on the transfer was the federal stop-order letter.

According to Commissioner Lamberts, it was the action of Mr. Lewis at this meeting that created her dislike for him.

It is her claim that when Mr. Lewis called Chief Johnson a "liar" or said he was "lying," an evident hatred of Mr. Lewis appeared.

On April 19, Mr. Lewis directed a letter to the LCC in answer to their letter of April 10, stating that the transfer was to be made to Dr. English and himself as partners. A copy was furnished to the Safety Committee. It was clear at this time that the transfer was to be made to the partnership.

On April 30, 1962, the application for renewal of the license at Barnett's Bar was filed with the LCC, signed by Mr. Lewis as attorney in fact. Receipt of the $500 fee was noted. The renewal was granted.

Some time between April 17 and April 22, Chief Johnson, through Officer Szumski, contacted district supervisor Arthur Arens and requested a new investigation by the LCC. This was a studied attempt by Chief Johnson to shift the tactic of delay to the LCC.

As a result of this conversation, on April 27, 1962, a memorandum was sent by Mr. Arens to Mr. Walter M. Noack, in which reference was made to the LCC letter of April 6; to the Forell letter of April 12; to the claim that the Grand Rapids Police Department had no notice of the power of attorney; and to the fact that Patricia Ettress was remarried and now living in Flint as Patricia Ettress Bell.

The answers to all these questions were contained in the March 20, 1962 settlement agreement, the letter of April 6, the power of attorney on file with the LCC, and, in addition, in the application for renewal of the 1962–1963 license.

*In response to the request of the Grand Rapids Police Department,* on May 1, and in answer to a letter of Mr. Arens, area enforcement supervisor, the LCC authorized a reinvestigation of this transfer. The following day, the LCC sent a communication to Mr. Arens asking him to accompany the investigator on this transfer. The LCC sent the previous investigation completed by Mr. Spyk and new investigation forms to Mr. Arens.

The same day, May 2, the LCC sent its form letter to the Grand Rapids City Commission asking that they take the usual action on this transfer and either recommend it for approval or disapproval. The Commission also sent its form letter to the Grand Rapids Police Department requesting that they investigate and stated: "If you do not feel that the applicant or applicants are qualified for licensing, will you kindly give your *reasons in detail*, using the back of the 1800 form * * *" (Emphasis added.)

On May 11, Mr. Arens sent a communication to the LCC stating that the delay in the LCC investigation was caused when Mr. Lewis told him that all the Bar's books were not available and would inform Mr. Arens when they were available.

Mr. Arens testified at the November 7 revocation hearing, however, that the first time he went to Mr. Lewis's office he was told that all the books needed were in a box which Mr. Lewis *showed to Mr. Arens.* Without looking at them, Mr. Arens claims that they were not all there, but admitted that Mr. Lewis pointed them out. Mr. Arens did not examine these books at that time.

Mr. Lewis claims that Mr. Arens would not look at the books at that time because Mr. Arens first wanted to talk with Mrs. Ettress. Mr. Arens's testimony on November 7 supports this. Mr. Lewis agreed to attempt to reach Mrs. Ettress at her new home in Flint and to have her come to Grand Rapids for an interview. Any delay in the LCC's second investigation at this time was caused by Mr. Arens's demand that Mrs. Ettress come to Grand Rapids and his refusal to look at the Bar's books until Mrs. Ettress was interviewed.

On May 28, Mr. Lewis wrote a letter to Mrs. Ettress asking when she could come to Grand Rapids to see Mr. Arens. No answer to this letter was ever introduced at the trial.

June 1, 1962, the Michigan Department of Revenue wrote Mr. Lewis stating that they had reinstated the license, but still held a stop on the transfer. They wrote that they expected Mr. Lewis to clear up the tax problem.

Although the Safety Committee had full knowledge of the named licensee, the receiver-attorney-in-fact Lewis operation, and the obligation of Mr. Lewis to pay all taxes—facts contained in the March 20 settlement agreement and the April 6 Maloney letter from the LCC, Commissioner Lamberts at the Safety Committee hearing on June 5, blandly stated that she did not understand the situation and asked that another communication be directed to the LCC for clarification.

Obedient to this instruction, the City Clerk wrote a letter on June 7 addressed to the LCC; it contained two questions:

"1. Under whose name is the Class C establishment located at 58–60 Ionia Avenue, S.W., Grand Rapids, now being operated and is the present licensee personally supervising the operation?

"2. What is the status of the above application?"

Chief Johnson, Commissioner Lamberts, and any of the City officials could have determined the answer to the first part of question number one by simply going to Barnett's Bar and looking at the license which, because of the law, would be hung in a conspicuous place in the Bar.

As stated above, they had the answer to the second part of question number one, as well as to question number two.

This letter was a tool in the tactics of delay and denial.

On June 8, Supervisor Arens wrote the LCC that he was holding the preliminary investigation in the district office; that Mr. Lewis was to notify him when the books were ready; that he attempted to see Mr. Lewis on the 6th, but that Mr. Lewis was not available. Yet, he failed to examine the books in Mr. Lewis's office.

Mr. Arens and Mr. Lewis met on the 12th of June in Mr. Lewis's office. Mr. Arens asked Mr. Lewis to write a letter

to the LCC stating that the postponement in the investigation was due to the unavailability of Mrs. Ettress. The letter was dictated by Mr. Arens and taken back to the Allegan office. The actual letter was not received by the LCC until August 6, 1962.

On June 18, Mr. Arens wrote the LCC that Mr. Lewis had requested more time in order to secure additional information concerning the transfer. This letter was followed on June 22 by Mr. Arens with a communication stating that the delay was due to the letter of June 12 asking to have the investigation postponed.

On June 29, Mr. Arens again wrote the LCC saying that he was going to meet with Mr. Lewis on July 3; it appeared, however, that Mr. Lewis was unable to secure the necessary papers to complete the transfer.

Another letter was sent by Mr. Arens to the LCC on July 9, in which he stated that the LCC should order Mr. Lewis to allow the investigation to be completed. These successive letters are inconsistent with the letter dictated by Mr. Arens on June 12, whereby the absence of Mrs. Ettress was given as the reason for the delay. She was as available to Mr. Arens as she was to Mr. Lewis. In normal procedures, field investigators from the LCC assist each other throughout the state on interviews.

Mr. Arens knew, understood, and participated in Chief Johnson's and Commissioner Lamberts' program of delay and denial.

As an example of his confused testimony, when asked why he thought a reinvestigation was needed, Mr. Arens replied that there was bankruptcy involved. No bankruptcy issue arose until September 10, five months after the LCC issued orders for the reinvestigation.

Mr. Arens also listed the dates when he tried to contact Mr. Lewis; parallel to these dates were dates on which he did talk to the police. Mr. Arens admitted that he worked closely with the Grand Rapids Police, so it is not surprising to find his manner evasive when certain questions concerning the police were asked.

At the regular Safety Committee meeting of July 24, the transfer transaction took on heightened importance. Present were Commissioners Barto, Lamberts and Vanden Berg (who had replaced Commissioner Sevensma on the Safety Committee as of May 1, 1962). Various representatives of the news media were present with cameras and tape recorders. The transfer and its ramifications already had received considerable coverage by newspapers and radio and TV broadcasts. Mr. Lewis, Dr. English, Mrs. Ettress, her attorney, Mr. Dewey, Chief Johnson and the City Attorney were also present.

Seeking further reasons to delay this transfer, Chief Johnson stated that Mrs. Ettress, the licensee, lived in Saginaw, although she actually lived in Flint. Chief Johnson claimed this was not desirable. This information had been communicated to Mr. Arens and it was contained in his interoffice communication of April 27, 1962.

The City Attorney, however, pointed out that it was not a violation in itself for a licensee to live in another city. He cited Mr. Schuler, of Schuler's Restaurant, as an example, and said other licensees did the same.

Federal Agent Forell's letter of April 12 to Chief Johnson about delinquent federal taxes was discussed. Mr. Lewis claimed Chief Johnson solicited this letter; but the transfer of the license could be approved subject to payment of all delinquent taxes through an escrow agreement.

Then, various city and federal tax problems were discussed. Commissioner Barto asked just why the transfer could not be approved subject to the payment of taxes. Mr. Lewis agreed that this was the simple and usual way to remove the impediment of unpaid taxes.

When Commissioner Vanden Berg asked Chief Johnson if all the tax problems had been resolved and what his recommendations were, Chief Johnson

held up the Forell letter, and said that he recommended disapproval because of this alleged federal stop order. This is the only reason Chief Johnson ever gave for denial of the transfer at any public Safety Committee or City Commission hearing when Mr. Lewis was present prior to the October 24 meeting.

When the discussion turned to payment of taxes through an escrow agreement, City Treasurer DeBoer objected to anyone being made escrow agent except himself. In fact, Mr. DeBoer testified that an arrangement had been made for money to be placed in escrow to pay the outstanding taxes. Therefore, on July 24, when Chief Johnson held up the Forell letter as a reason for denial, his objection was without any substance.

Commissioner Lamberts pointed out that the Safety Committee had not received an answer to the Committee's letter to the LCC of June 7. When Mr. Lewis reminded the Committee that the letter of April 6 from the LCC to the Grand Rapids Police answered their questions, Commissioner Lamberts said she refused to accept this letter as an answer to the Committee's letter—an obviously dilatory tactic.

Commissioner Barto agreed that the April 6 letter answered in substance the Commission's questions posed in the June 7 letter.

According to Commissioner Barto and the minutes of the July 24, 1962 hearing, Commissioner Lamberts said there would be no decision on this transfer until the letter of June 7 was answered. All persons present seemed to agree that the meeting was adjourned so that another letter could be directed to the LCC and a definite answer could be obtained to the questions posed by the Committee. Clearly, the hearing was adjourned for three weeks.

Before adjourning, the Committee asked Mrs. Ettress to make a statement in regard to this transfer. She stated that the transfer was satisfactory to her as long as all her debts were paid. Her attorney was asked for his position, and Mr. Dewey stated that the settlement filed on March 20 was proper and that a transfer to Mr. Lewis and Dr. English was in the best interests of his client.

Dr. English made an important statement at this hearing. When given an opportunity to speak, he said he was disturbed because no reason had ever been given him for the Committee's apparent disapproval of this transfer. Someone on the Committee said that this had nothing to do with Dr. English.

Dr. English's impressions of the nature of the hearing were that he was treated more as a criminal than as a citizen looking for a license. He believed that Commissioner Lamberts' attitude was very hostile, but that Commissioner Barto was at the same time most courteous.

The Commissioners knew Dr. English did not want to operate the Bar alone. He was only interested in the operation if Mr. Lewis would run the Bar.

No one except Commissioner Lamberts and Chief Johnson could recall that reasons for apparent disapproval of this transfer were given at this open meeting, or at any previous meeting at which Dr. English or Mr. Lewis was present.

Chief Johnson specifically testified at the November 30, 1962 show cause hearing that the first time he gave reasons at a meeting at which the transferees were present was October 24, 1962, a hearing on revocation. He attempted to qualify this in his testimony at the trial, but was obviously attempting to patch up the absence of reasons given before disapproval of the transfer on July 31. In this respect, his testimony is self-contradictory.

Commissioner Lamberts claims all matters discussed at the hearings were reasons for disapproval of the transfer.

This court finds as a matter of fact that no reasons, other than Chief Johnson's reference to the Forell letter, were ever given.

Commissioner Lamberts claimed that a specific reason for the delay of any decision on the transfer was because the new investigation authorized on May 2, 1962, had not yet been completed by the

LCC. Yet, this did not seem to hamper the Safety Committee on July 31 when it finally adopted a resolution disapproving the transfer, because the LCC's reinvestigation was at the instigation of Chief Johnson, and it was used as an excuse for delay.

After the July 24 hearing was adjourned for three weeks, someone on the Committee decided that the Committee should talk to Mrs. Ettress alone to find out what her real attitude was toward this transfer. Commissioner Vanden Berg said that he felt Mrs. Ettress was afraid to speak out at the public hearing.

The Safety Committee took Mrs. Ettress into the City Attorney's office and questioned her without her attorney, Mr. Dewey, being present. It is noteworthy that although given the opportunity, none of the Committee members testified that Mrs. Ettress said anything at this private meeting different from what she had in the public hearing.

At this time Mrs. Ettress wanted the license transferred to Mr. Lewis and Dr. English. This was in her best interest. If the Safety Committee and the City Commission had acted favorably at that time, there would have been no subsequent bankruptcy.

There was a definite conflict in the testimony as to whether the hearings on this transfer concluded on July 24, leaving only the decision to be made, or whether the hearings themselves were adjourned for three weeks. Many present at the July 24, 1962, hearing were left with the impression that the hearings were adjourned to await the answer from the LCC to questions which the Safety Committee thought vital to the issues; the minutes reflect that this was done. It hardly seems possible that the decision only was adjourned.

On July 25 another letter was written by the City Clerk to the LCC seeking to find out whose name was on the license and if the licensee was personally supervising the operation of the Bar. However, the minutes of the July 24 hearing clearly show the Safety Committee was informed Mrs. Ettress was the licensee and Mr. Lewis operated the Bar under a power of attorney.

That same day, Commissioner Lamberts called the LCC and received orally the LCC answers to the questions raised by the Safety Committee's letter. She was informed at that time that the license was issued to Mrs. Ettress and that it was being operated by Mr. Lewis under the power of attorney dated March 29, 1962.

August 3, the LCC formally answered the letters of the Safety Committee and pointed out that the information had been given to Commissioner Lamberts by telephone on July 25. The letter said that the information passed on by telephone was, in substance, that Mrs. Ettress was still the licensee and that the Bar was being operated by Mr. Lewis under a power of attorney.

The court finds that Commissioner Lamberts knew and understood these facts from April 17, 1962, and throughout all the remaining proceedings.

Although either the hearings or the decision was adjourned for three weeks on July 24, the Safety Committee at a regular meeting for July 31, passed a resolution recommending that the City Commission disapprove the transfer to Dr. English and Mr. Lewis. The transfer matter was not on the agenda for the July 31 meeting, but Commissioner Vanden Berg testified that all matters which had been tabled were automatically on the agenda.

Commissioner Lamberts testified that the decision to disapprove probably could have been made on July 24, except that the meeting was short. She stated that the decision was made on July 31, instead of three weeks after July 24, because it was discovered that two of the three members of the Safety Committee had planned vacations which coincided with a meeting date three weeks after July 24.

No one testified whether Commissioner Lamberts relayed her telephone-call information to the Safety Committee at that time. The Committee, however, did not wait for a formal answer to their letter

of June 7, nor did they wait for the second investigation by the LCC initiated at the request of the Grand Rapids Police Department.

They passed at the end of the meeting two resolutions bearing on this transfer:

"12801. Com. Lamberts moved that the request from Dr. Cortez A. English and Alphonse Lewis, Jr. for transfer of ownership of Class C license, located at 58–60 Ionia Ave., S.W., from Patricia Ettress, be recommended for disapproval.

"Carried.

"Yeas: Coms. Barto, Jamo, Lamberts, Sevensma, Sypniewski, Vanden Berg—6. Nays—0."

"12802. Com. Lamberts moved that the City Commission request the Michigan Liquor Control Commission to suspend and place in escrow the Class C License, located at 58–60 Ionia Ave., S.W., issued to Patricia Ettress (Bell), until said license is transferred.

"Carried.

"Yeas: Coms. Barto, Jamo, Lamberts, Sevensma, Sypniewski, Vanden Berg—6. Nays—0."

The only written record taken at this meeting was the notes of the secretary to the City Clerk. According to these minutes: "Motion made by Com. Lamberts and seconded by Com. Vanden Berg that this request be denied on the basis of the Police Department recommendation and that a resolution be presented for action at the City Commission meeting. Motion carried."

Before January 16, 1962, and throughout the entire proceedings, Mr. Lewis sought reasons for both the police department's and the Safety Committee's delay in processing the LCC 1800 form and in acting on the application for transfer.

No reasons (other than the Forell letter) were ever given at any public meeting in the presence of Mr. Lewis or Dr. English.

Mr. Lewis requested a public hearing with the rights guaranteed by due process, examination, confrontation, and cross-examination of witnesses. This the Safety Committee and the City Commission steadfastly refused to do.

The court ruled any reasons not given in the presence of Mr. Lewis were inadmissible. Over the objection of the plaintiff, however, the court permitted the defendants to introduce into evidence as part of a segregated record,[2] reasons which they claimed were the basis for their disapproval of the transfer.

It is claimed the Safety Committee communicated to the Committee of the Whole and the City Commission, its reasons for denial of the transfer. The court finds that the reasons, if any, were post factum to the July 31 meeting of the Safety Committee, the Committee of the Whole, and the City Commission.

These will be more fully discussed hereafter in this opinion.

Because of the action by the Safety Committee and the City Commission which disapproved transfer, and on the advice of her husband, Mr. Bell, Patricia Ettress Bell, on August 2, sent a letter of revocation of the power of attorney she had given to Mr. Lewis, to the LCC.

On August 6, 1962, the LCC on an interoffice memorandum summarized the history of this transfer and noted that the City Commission did not recommend transfer, but requested that the license be placed in escrow. A note was also made that Mrs. Ettress had filed a revocation of the power of attorney.

On August 6, the LCC filed an order denying the transfer to Mr. Lewis and Dr. English "after considering the unfavorable recommendation of the City Commission." The escrow question was referred to the legal counsel for the Commission.

---

2. Since this case was tried without a jury, a segregated record as such was not made. All evidence, however, which relates to post factum reasons given by the Commissioners in their testimony is, for the purpose of this case, considered as a segregated record.

Mr. Lewis wrote the LCC August 9, requesting a hearing on the Grand Rapids City Commission action because no reasons were ever given him in support of the disapproval.

Mr. Lewis wrote a similar letter to the City Commission on August 13 asking for a rehearing.

August 16, the LCC answered Mr. Lewis's letter and said "inasmuch as an appeal hearing before the LCC would not accomplish the result you desire, your request for a hearing must be denied. We suggest you communicate with the Grand Rapids City Commission * * *"

In relation to the escrow problem, the letter notes: "It is the opinion of the LCC legal counsel that in the absence of any citation, due process, and hearing before the hearing commissioner, it is precluded from taking such action."

Another note in the LCC file at this time says: "Escrow is a voluntary arrangement by licensee; cannot be forced upon him without violation hearing."

On August 21, Judge Stuart Hoffius of the Circuit Court issued a temporary injunction restraining Mrs. Ettress from interfering in any way with the transfer of the license. This in effect invalidated her attempted revocation of the power of attorney until all transfer issues were resolved. This injunction was later set aside by the Circuit Court.

On August 29, the Grand Rapids City Commission denied Mr. Lewis's request for a rehearing on the transfer.

The City Attorney, James Miller, at the request of the Safety Committee, wrote the LCC on September 4 claiming violation of Rule 17 and Rule 31 of the regulations by Barnett's Bar, and requested the LCC to suspend the license. The letter stated the Committee's position that if the LCC could not take this action, then the Grand Rapids City Commission must consider revocation of the license.

Mrs. Ettress filed a voluntary petition in bankruptcy on September 10. She was represented in the bankruptcy proceeding by Mr. Frederick Poel.

September 12, Mr. Healy, attorney for the LCC, directed a letter to the City Attorney. Noting the City Attorney's letter of September 4, the Assistant Attorney General set out the steps necessary in finding a violation, if any, of Rule 17 and Rule 31 by Barnett's Bar. He stated an investigation would have to be made and certain hearings would follow before a violation of any Rule could be found.

On October 2, after citing certain facts about the license at Barnett's Bar, the Grand Rapids City Commission (or Safety Committee) ordered all interested parties to show cause why the license should not be revoked. The following day, the City Clerk sent letters to all interested parties stating that the first show cause hearing would be held October 16.

On October 10, in preparation for the pending revocation hearings, Mr. Lewis distributed to all City Commissioners a statement of his position. In this statement, he challenged all the purported reasons for action taken against this license; he made further accusations in regard to the use of these reasons; and he demanded a fair public hearing, with the right to subpoena witnesses, cross-examine them, and have the hearings completely reported by a proper stenographer.

Commissioner Lamberts does not recall if this statement was introduced at a hearing when a reporter was present. The only transcripts available show conclusively that it was not. The challenges made by Mr. Lewis in this statement were never publicly answered, accepted, or denied by either the Commissioners or by Chief Johnson.

October 11, the City Attorney sent a carefully detailed letter to the City Commission setting out certain ground rules for the conduct of a revocation hearing. He specifically advised that due regard for proper procedure be had.

Commissioner Lamberts' comment on this letter was to the effect that the City Attorney only makes "suggestions" to the Commission, and that the Commission sets its own rules. She clearly intended to continue to disregard the constitution-

al, as well as the statutory mandates of due process.

The first revocation hearing was held October 16. No record of any nature was kept for this hearing. According to the testimony of certain parties, at least the following occurred: When ground number five [3] in the original resolution relating to criminal activity was challenged by Lewis, the City Attorney recommended that this provision be dismissed.

There was some confusion at this hearing as to whether the topic was revocation or transfer. It appears that Mr. Lewis insisted at some of these hearings that what they were actually doing was rehearing the transfer issue.

At the time of this first hearing, at least Commissioner Lamberts was aware of the court injunction against Mrs. Ettress, and she stated that she did not object to this restraint. However, she did contact Judge Hoffius and discuss the matter with him.

Present at the second hearing on October 24 were the Trustee in Bankruptcy for Mrs. Ettress, Mr. Nichols, his attorney, Murray DeGroot, and Mr. Lewis. Commissioner Lamberts again demanded that the license be placed in escrow. At one point, Mr. DeGroot asked that Mr. Lewis be excused from the meeting so that a proposal could be made. This was done. When Mr. Lewis returned, the City Attorney, James Miller, asked Chief Johnson to give some "good" reasons why he objected to the transfer to Mr. Lewis.

Chief Johnson then gave as his reasons that Mr. Lewis did not have the proper temperament for a licensee; that as a lawyer he represented certain people in that location; that he was a borderline operator; that he needed an entertainment permit; and that he was open on Monday mornings from twelve o'clock to two o'clock—legal, but the other bars do not do this.[4]

Commissioner Barto testified that so far as he recalls this was the first time any specific reasons were given for disapproval of Mr. Lewis as a licensee at a public hearing at which Mr. Lewis was present. Commissioner Jamo agreed that this was the first time *any reasons* were stated at a hearing, and this court so finds.

At the close of the October 24 hearing, Commissioner Lamberts moved that Mr. Nichols be requested to take the necessary steps to have the transfer completed to him and then to have the license placed in escrow.

A memorandum in the LCC file shows that on or about October 25, Commissioner Lamberts made a telephone call to someone in the Commission offices. The memorandum states that in summary she said the following:

(1) The LCC was shirking its responsibility with regard to this license;

(2) The County Prosecutor may ask for a grand jury investigation of

---

3. "5. Unlawful activities have been allowed or suffered to take place in such bar, though, with proper management and control by the licensee and owner, the same should have been prevented, and * * *."

4. 10/24/62 Safety Committee Hearing
 "Miller: Give us some good definite reasons.
 "Johnson: We did not recommend against Dr. English. We recommended against the transfer to the partnership. Our objections are he is a borderline operator. He has occupied a plural roll (sic). He has held the power of attorney. He has likewise represented people in Superior Court, people whom we have arrested down there. In two instances your operation has been a borderline operation. You are operating from 12 to 2 o'clock Sunday night. I admit it is legal, but if all bars elected to stay open those hours—
 "Barto: If it is legal—
 "Johnson: What about your quasi entertainment? You are right on the borderline. We maintain you should have an entertainment license.
 "Lewis: It has never been required.
 "Johnson: Since 1959 you have had a plural association and arrangement at that location. You were Mrs. Ettress' legal counsel; you were her manager, you operated with a power of attorney, you represented people in court who were arrested at that location. Because of these overlapping responsibilities I cannot indorse your plurality of associations."

the LCC in connection with complaints concerning Mr. Lewis and this bar; in reply, the LCC told Commissioner Lamberts that the Commission records were public and that they would be happy to make them available to a grand jury;

(3) She stated she was in sympathy with the Police department's unwillingness to approve Alphonse Lewis as a licensee because he makes his living defending criminal cases and his attitude toward the police in court is reprehensible; that the same kind of people whom he represents frequent the bar and she agrees with the police that this is not proper.

Richard Loughrin, who was Kent County's Prosecuting Attorney in 1962, testified he had not considered calling a grand jury investigation as claimed by Commissioner Lamberts.

Commissioner Lamberts and Chief Johnson would deny a license to Mr. Lewis because he practices as a defense counsel in criminal cases. Such a denial would penalize an attorney for performing his professional duty as a lawyer.

Such a denial is invidious discrimination, because, as is pointed out later in this opinion, other attorneys actively engaged in the practice of law have owned, and do own, liquor licenses or interests in a liquor license.

It would indeed be a sorry day in the history of Grand Rapids and this country if a lawyer should be penalized because he performs his professional duty as a lawyer.

On November 1, the Bankruptcy Court, after hearings, entered an order declaring the Trustee the owner of the license. The order was contested by Mr. Lewis, who claimed title in the license, and on November 7 a stay was filed, along with a petition for review of the order declaring the Trustee owner.

The third revocation hearing was held November 7. A court reporter was present and a transcript was made. The transcript shows in effect that certain witnesses were present and called to testify for the City. It shows that cross-examination of these witnesses was limited by the Safety Committee for those who had the burden of showing cause why the license should not be revoked. Particularly interesting, but confusing and contradictory, is the testimony of Mr. Arens.

At the close of the November 7 hearing, Mr. Lewis was in the process of cross-examining Mr. Arens. The Committee agreed that Mr. Arens would be considered under subpoena for the next meeting. At the next meeting on November 13, Mr. Arens did not appear for further cross-examination.

This failure, plus the actual testimony of Mr. Arens on November 7, affects the weight, sufficiency, and credibility of Mr. Jamo's testimony in this case and his conclusion that Mr. Lewis failed to cooperate with Mr. Arens.

A reporter was present at the final hearing and a transcript of the proceedings was made. Certain witnesses were present for Mr. Lewis and the Trustee; but, the Commission did not allow these witnesses to be called. Chief Johnson was not cross-examined thoroughly, because the Committee said it had set a time limit on the hearings.

At the close of the hearing, the Safety Committee recommended, after setting forth five reasons, that the license be revoked unless placed in escrow by November 20.

The effect of this resolution can only be seen when certain legal facts, known to the Safety Committee, are considered. First, the Bankruptcy Court had declared the Trustee to be the owner of the license, and, therefore, the only person who had a title interest in the license, and the only person who, according to the letter of the LCC, could place the license in escrow.

This order, however, was stayed, and was made subject to review by the District Court. This meant that the Trustee could not exercise his claim of ownership

and place the license in escrow, or do anything else, such as take possession of it. Mr. Lewis by his petition for review had at least an inchoate interest in the license and became, along with the Trustee, a proper person to act in regard to the license.

Since escrow is a voluntary arrangement, and since both the Trustee and Mr. Lewis had reasons for not placing the license in escrow, the resolution was then, in effect, an ultimatum.

On November 14, the Bankruptcy Court extended its stay order. The same day the Trustee petitioned for and got a restraining order issued by the referee restraining the City Commission from acting further in regard to the license.

Also, on November 14, Commissioner Lamberts sent a telegram to Attorney General Kelley setting forth the Safety Committee findings in detail, and reporting that unless the license were placed in escrow by November 20, it would be revoked.

On November 19, 1962, Mr. Lewis commenced the present case in this court.

On November 20, the Safety Committee reported to the City Commission that because of their prior hearings and because of the fact that the license was not in escrow, the Committee asked the City Commission to pass a resolution requesting the LCC to revoke the license at Barnett's Bar. The report also noted that personal property taxes in the amount of $775.41 were due.

The resolution for revocation was adopted by the City Commission with only Mayor-Commissioner Davis dissenting.

November 21, the LCC wrote Commissioner Lamberts noting that her telegram to Attorney General Kelley had been referred to them. They recognized the bankruptcy jurisdiction concerning the license. The letter then pointed out:

" * * * the Michigan Liquor Control Commission would be pleased to enter the Bankruptcy Court and request permission to comply with its statutory obligation to revoke this license upon being furnished with evidence showing that a proper hearing was held by the City Commission of Grand Rapids, after due notice, and that the City Commission acted to request revocation of the license.

"This evidence should consist of a copy of the notice and proof of service, a certified transcript of the proceedings showing the dates of the hearings, and who were present and absent from the City Commission."

On this same day, the Bankruptcy Court continued its restraining order against the City Commission, subject to any determination in the Federal District Court on the case commenced by Mr. Lewis on November 19.

On November 21, this court issued a temporary restraining order and an order to show cause why a preliminary injunction should not be issued pending the final hearing of the claims in the suit filed. This order restrained the City Commission, its agents and employees, from sending the revocation resolution to the LCC and from taking any other action until the show cause hearing.

At the close of the hearing, the court continued the injunctive provision of the restraining order. The resolution was not sent to the LCC.

In late January or early February, during the pendency of this case, Commissioners Lamberts and Jamo drove to Lansing to discuss transfer, revocation, and this present litigation with the legal adviser to Governor Romney, Mr. Richard VanDusen.

They took with them specific exhibits and information about this case. They sought assistance from Mr. VanDusen to persuade the LCC to take action which by reason of the restraining order of this court they could not directly ask the LCC to do. They sought to have the LCC cooperate fully with the Grand Rapids City Commission. Commissioner Jamo testified he had read the restraining order and knew its contents.

This is clear and compelling evidence of the continuation of the conspiracy on the part of at least Chief Johnson and Commissioners Lamberts and Jamo to deny the constitutionally protected rights of Mr. Lewis.

There are certain general facts found by the court that do not fit into the exact chronological pattern, but which are extremely important if one is to understand the whole fact picture. The testimony of certain witnesses also deserves comment.

Mr. Loughrin, former prosecuting attorney for Kent County, stated that no complaint was at any time filed with the prosecuting attorney's office concerning the action of Mr. Lewis, and that during his tenure into 1962, no request was ever made for a grand jury investigation concerning this matter. As far as he knew, the prosecutor's office never told Commissioner Lamberts that grand jury action was contemplated. Mr. Loughrin said he knew that there was animosity between Mr. Lewis and Chief Johnson, but that he could never pin down the source of it.

Prosecuting attorneys must work closely with the police department; this explains the fact that Mr. Loughrin had a very difficult time explaining Chief Johnson's attitude toward Mr. Lewis. Also, Chief Johnson was present in the court room at all times when Mr. Loughrin testified.

The City Clerk, Mr. Stanton Kilpatrick, said that he knew Mr. Lewis had made attempts to have the police investigation form 1800 filed with the City Clerk's office. This form was never made available to the Safety Committee through the City Clerk before the disapproval of July 31. Safety Committee hearings on a transfer are not usually begun until all forms are on file, including the report of the police investigation, form 1800. Mr. Kilpatrick stated that it was unusual for the 1800 form to require eight to ten months to be transmitted from the police department to the Safety Committee.

In his nine years of investigation work for the LCC, Mr. Spyk said he had never seen a case where the police went into the affairs inquired of in this case. He could recall no other time when the police had questioned the financial arrangement behind the transfer; when the police had secured a statement from the transferor that she did not want to transfer; or that different taxes were owed by anyone connected with the license.

Negro Police Officer Dred Scott Madison stated that on his own investigation he gathered information concerning gambling in the basement of the building in which Barnett's Bar was located. He reported this to Chief Johnson, and also told the Chief that on the basis of his talks with Mr. Lewis, Officer Madison was certain that Mr. Lewis was unaware of the gambling. Officer Madison also testified that he could recall no raid on any other licensed business place in his sixteen years on the police force.

Dred Scott Madison claimed that Chief Johnson practiced discrimination, and cited his own demotion as evidence of this discrimination.

Mr. Charles Dewey, Mrs. Ettress' attorney after January of 1962, stated that the settlement arrangements made in March of 1962 were aimed at avoiding bankruptcy. He also testified that at the July 24 hearing he remembered hearing no reason given as to why Dr. English and Mr. Lewis were undesirable transferees.

Mrs. Ettress related that she had worked the day shift on the bar since 1959 unless some substitute was obtained.

Mr. Lewis claimed that Patricia Ettress Bell took some $30,000 out of the business.

Mayor Stanley Davis is by virtue of his position as Mayor also a City Commissioner. He was absent from the meeting of the Committee of the Whole on July 24, when it is claimed that reasons were given by the Safety Committee for the disapproval of the transfer. However, Mayor Davis testified that he was aware of all the meetings and discussion of this transfer; and his best recollection is that the only reason for the disapproval of the transfer was the

hatred of some City Commissioners and Chief Johnson for Alphonse Lewis.

When the hearings for revocation culminated, Mayor Davis stated that he had not heard anything to warrant revocation and, therefore, voted against it. Again at that time, he was impressed with the obvious dislike of Mr. Lewis by some members of the City Commission and Chief Johnson.

Commissioner Barto, Chairman of the Safety Committee, recalled asking at one of the revocation hearings why the "yes" for recommendation on the 1800 form had been changed to "no", when no reasons were given. He never received an answer.

Mr. Barto also testified that Mrs. Patricia Ettress Bell and her attorney never made any claim against Mr. Lewis at any of the hearings. Mr. Barto was also present when the Safety Committee members talked to Mrs. Bell alone, out of the presence of her attorney, Mr. Dewey.

As far as the arrangement for taxes was concerned, Commissioner Barto stated that an escrow plan had been set up whereby the due taxes would be paid upon transfer. In fact, at one point Chairman Barto told the Safety Committee that all it had to do was to approve the transfer, subject to the payment of the taxes. He understood, at least, that if the transfer was approved, the taxes would be paid.

When asked if there was a faction of the City Commission controlled by Commissioner Lamberts, Mr. Barto replied, "Sometimes I think so."

Commissioner Sypniewski testified that no reasons for disapproval were ever given to Mr. Lewis in a public hearing. All the alleged reasons were given at the meeting of the Committee of the Whole, or in informal discussions among the various Commissioners. Great reliance was placed on what the Safety Committee reported concerning this matter, for they had been working on this matter for some time. He commented that although Mr. Lewis had repeatedly asked for reasons, none were given to Mr. Lewis. He also recalled that Chief Johnson did not give any reasons until the October revocation meeting.

When Commissioner Sypniewski was asked if he had seen gambling on other licensed premises, he answered, "as a citizen, yes."

Mr. Vanden Berg was a member of the Safety Committee from May 1, 1962 through the revocation hearings. He replaced Mr. Sevensma. When he came on the Committee, he said he was aware from all the other members how this particular transfer was going. He said he felt a need for quick resolution to the proceedings; that certain information, as requested by Commissioner Lamberts, was needed from the LCC to bring an end to this lengthy hearing.

Commissioner Vanden Berg, who only attended two meetings of the Safety Committee at which the Barnett's Bar license transfer was discussed, testified that reasons were given to Mr. Lewis at the July 24 and other Safety Committee hearings for their disapproval. The court, however, finds contrariwise.

Then, he added that it was not normal for the Safety Committee to give the reasons because of possible embarrassment to the applicant. Mr. Vanden Berg testified that if Mr. Lewis had asked for the reasons before the disapproval, Mr. Vanden Berg would have asked him if he really wanted them, and then would have given them. This is clearly contradictory.

When Mr. Vanden Berg gave his own reasons for disapproval, he listed: (1) Mr. Lewis's plural relationship; (2) the conflict of interest; (3) a violation of the fiduciary position held by Mr. Lewis; (4) an infraction of the law had occurred at the Bar; and (5) taxes had not been paid.

These are set out only to show that his reasons conform conspicuously to Commissioner Sevensma's notes prepared specially for this trial, which were improperly used by Commissioner Sevensma to refresh his recollection while he testified on these issues in court.

Mr. Vanden Berg stated, however, that he never inquired into the exact relationship Mr. Lewis had with Mrs. Bell as attorney; he did not know when Mr. Lewis had so served her, or how. Commissioner Vanden Berg never inquired whether the money owed to Mr. Lewis by Mrs. Bell was reasonable for his services performed. He stated that he had learned of the infraction through the newspapers—that someone had pleaded guilty in gambling charges at the Bar. He also testified that he did not know that Mrs. Bell had worked the day shift at the Bar and had access to the money taken in. He never inquired why Mrs. Bell did not pay the taxes.

Commissioner Vander Berg also stated that at one time he heard Commissioner Lamberts say that Mr. Lewis would never have anything to do with this Bar. Commissioner Vanden Berg received his information from the newspapers, Commissioner Lamberts, and Chief Johnson.

Commissioner Sevensma was a member of the Safety Committee from 1960 to May of 1962. Being the only attorney on the Safety Committee, he was given the task of investigating the Kent County Circuit Court file when the first hearing was held on January 16, 1962.

Commissioner Sevensma refreshed his recollection on direct examination from notes which he especially prepared for use at the trial. When the court saw Mr. Sevensma making reference to yellow legal pad note papers, the court asked the witness to submit these notes to the court for examination.

The witness admitted that these notes had not been prepared at the time of the occurrence of the particular events in this case. The court then made the notes an exhibit in the case.

Direct use of such notes almost exclusively for the purpose of refreshing recollection is dangerous and improper. It subjects the witness' testimony to careful scrutiny. It casts a cloud of incredibility and insufficiency over Commissioner Sevensma's entire testimony. Parsons & DeCosta v. Wilkinson et al.,

113 U.S. 656, 5 S.Ct. 691, 28 L.Ed. 1037, and the cases growing out of Parsons.

Insofar as other Commissioners' testimony conforms to the Sevensma testimony, it likewise casts a cloud over such other Commissioner witnesses' testimony.

The danger involved from such practice was particularly emphasized to the court when Commissioner Sevensma testified as to his examination of the bill of complaint in the Kent County Circuit Court action.

This testimony, his notes, and the reference to the bill of complaint in the Circuit Court action, convince this court that the witness' testimony reflected post-factum judgment and conclusions to any of the events about which he testified.

In regard to the money owed by Patricia Ettress Bell being equal to the debt claimed by Mr. Lewis, Commissioner Sevensma said that he never sought to find out if the LCC had investigated the financial arrangement for the transfer. He did know that this was within their usual jurisdiction. Commissioner Sevensma was aware that provisions had been made for the payment of the due taxes through an escrow agent.

Mr. Sevensma felt strongly about the nature of a liquor license; in his opinion, whenever there was any sign of gambling at a bar, the license should be revoked. His own knowledge of gambling in this case was from hearsay. He never read the pleadings or the record in the gambling cases; he did not know that there was a preliminary examination; he did not know the facts surrounding the arrest and subsequent plea of guilty by Wesley Calloway.

Although Commissioner Sevensma is an attorney and a former deputy and assistant prosecuting attorney, yet he was content to rely on rumor, hearsay, speculation, and the vindictive attitude of a fellow commissioner, as well as of the Chief of Police. By this reliance, Commissioner Sevensma would deprive Patricia Ettress Bell of the benefits she would receive as a transferor, and he would also deny Mr. Lewis and Dr. English a valuable Class C liquor license.

In effect, without knowledge of the facts, Commissioner Sevensma condemns Mr. Lewis for alleged condonation of unproven gambling offenses on the licensed premises.

Upon such shifting sands of flimsy evidence Commissioner Sevensma would impose the ultimate penalty of revocation of the Class C liquor license at Barnett's Bar.

When Commissioner Sevensma on cross-examination was informed of the facts in the alleged gambling cases, he stated that if he had known these facts, his judgment about the case would have been different.

Commissioner Jamo was elected in May of 1962. He was not a member of the Safety Committee, but attempted to keep in touch with the details of the Barnett's Bar license transfer. He first stated that the evidence of gambling in the Bar made the operation a very poor risk. His source of information on the gambling charge was Commissioner Lamberts, who told him that Wesley Calloway had been arrested for possession of gambling paraphernalia in the Bar. He did not know that all the cases concerning violations in Barnett's Bar were dismissed.

Commissioner Jamo was not aware that the LCC's authorized May investigation was actually a reinvestigation instigated at the request of Chief Johnson. He had discussed this matter with Chief Johnson, but did not see the 1800 form before July 31. Commissioner Jamo acknowledged that the form 1800 in evidence is inconsistent.

Mr. Jamo said that the unpaid taxes were a big hurdle for him. He explained he never was advised that the taxes could be paid out of the purchase price, for example, or that money could be placed in escrow to pay the taxes contingent on the approval of the transfer.

Commissioner Jamo stressed that this city needs Mr. Lewis in his role as a negro attorney and not as operator of a bar, and that he should practice law and not run a bar. The court observes that if Mr. Lewis has the good character and integrity necessary to practice law, he certainly ought to possess the character and integrity to operate a licensed liquor establishment.

Chief Johnson testified at the November 30, 1962 show cause hearing and at the trial on the merits. There were two outstanding features about his testimony at the November 30, 1962 hearing in Federal Court. First, he clearly answered that the only time reasons for disapproval were ever given by him at a public hearing at which Mr. Lewis was present, was at the October 24, 1962 revocation hearing.

At the trial of this case, Chief Johnson attempted to clarify his testimony which he gave in the Federal Court hearing on November 30, but this attempt only convinced the court that he was trying to escape the clear implications of his first testimony. His testimony during this trial is conspicuously contradictory and incredible in many respects.

Secondly, Chief Johnson's appearance on the stand at the first November 30, 1962 hearing convinced the court that he hated Mr. Lewis. He testified with great difficulty; he was quickly exasperated, and clipped off his answers. When extensive questions were asked by Mr. Lewis, the Chief grew redfaced and tightlipped; the blood vessels in his head bulged out.

By his exposure on the witness stand, Chief Johnson displayed explosive animosity and great hatred for Mr. Lewis. His testimony, plus that of the Trustee, Mr. Nichols,[5] convinced the

---

5. "Mr. Nichols: * * *
"Now, as to whether or not I would actually go in there and operate this bar under these present complicated situations and the personal animosities as I have seen them demonstrated in the City Council offices and the Safety Com-

mittee, I wouldn't want to operate this bar under any given set of circumstances.
"Q. (By the Court) What do you mean by the personal animosities of the City Safety Commission?
"A. Well, your Honor, I feel very definitely that there are very personal

court that there were probable violations of constitutionally protected rights and compelled the court to retain this action for a full hearing on the merits.

While Chief Johnson was on the stand, his testimony, demeanor and attitude impressed upon the court the conclusion that the Chief's actions in this case were motivated by malice.

Chief Johnson ordered the 1800 form changed from an affirmative recommendation for transfer to negative *after* the July 31 action of the Safety Committee. Thus, at the time of the resolution of disapproval, the police investigation form *recommended* transfer. The investigation had been completed by Officer Szumski; Chief Johnson disagreed with the results.

This is particularly important, since the minutes of the Safety Committee meeting of July 31 show that its disapproval was based on the recommendations of the police.

We must remember that the 1800 form was never made available to the Safety Committee before July 31. Therefore, we reasonably infer that the Safety Committee placed substantial reliance upon the personal recommendation of Chief Johnson—a recommendation rooted in hatred and motivated by malice.

When the Chief ordered the 1800 form changed after July 31 to coincide with his own recommendation, he neglected to see that the report was consistent. The report in its changed form states:

"From your observations or conversation with the above person are

you of the opinion that he (she) is properly qualified to conduct such a business? Yes [x] No [ ]

"Do you recommend granting this license—no * * * If not, state reasons * * * "

Therefore, contrary to the directive of the LCC letter and the obvious demand of the 1800 form itself, no reasons were stated on the form why the transfer was not recommended.

The court noted the speed with which the police disposed of the Lewis investigation in 1961—they received notice to investigate on June 2 and sent their reply back on July 11. That time, however, they had stated a reason for not recommending transfer: there was a gambling charge pending.

The second investigation by the Grand Rapids Police Department never did reach the Safety Committee. Form 1800 recommending approval of the transfer was completed by Officer Szumski on November 1, 1961. It was changed by order of the Chief some nine or ten months later. It was never sent to the LCC, although the LCC had requested its return with reasons.

Chief Johnson stated in his testimony that the regulations governing liquor licenses required cooperation with the police, and he felt that no attorney could fulfill this obligation. Such a regulation was never intended to force licensees to become subservient to any unreasonable and unconstitutional demands of the police.

It was pointed out that other attorneys were licensees in the City of Grand Rap-

feelings in this case. I feel that there are people on the City Commission who are approaching this problem with an entirely closed mind; that they do not propose to listen or hear.

"We have off the record approached members about this. I explained to them that my job as a trustee was to sell this property immediately. My counsel and I had a package worked out whereby this bar was sold for money, and we had an agreement of all parties, and I was assured that only over certain dead bodies would the transfer ever be permitted, and I

think that that precludes any possibility of my operating this bar.

\* \* \* \* \*

"RE-EXAMINATION BY MR. LEWIS:

"Q. Who was this animosity directed to that you testified to, Mr. Nichols?

"A. Well, Mr. Lewis, very obviously, in my mind, it is you.

"Q. Now, isn't it true that if it could be worked out and you have been advised if it could be worked out so long as I have nothing to do with it, the bar could continue operating?

"A. I have heard that said publicly."

(Tr. November 30 hearing, pages 95–96.)

ids, and the Chief said he knew this. But no objection was ever made, nor could one reasonably be made, that these other attorneys because of their profession are unqualified to be licensees.

In fact, this position by the Chief supports the court's impression that part of the personal vendetta by him against Mr. Lewis resulted from Mr. Lewis's practice of his profession in trial work: in defending persons charged with crimes; in particular, in Mr. Lewis's successful defense of the persons charged with violations of the gambling laws at Barnett's Bar; and in the successful defense of Mrs. Ettress before the Liquor Commission. Chief Johnson wanted to close Barnett's Bar, the lone negro-owned Class C liquor license in Grand Rapids.

■ It is common knowledge that any attorney who defends persons in criminal cases has many occasions to disagree with police officers. There is testimony that Mr. Lewis on occasion was exceedingly aggressive in his approach to such cases. Perhaps this is what the Chief meant by lack of "cooperation." Chief Johnson stated that he had discussed Mr. Lewis's trial techniques with Commissioner Lamberts many times.

From these many discussions and the evident close cooperation between Chief Johnson and Commissioner Lamberts, the court concludes that Chief Johnson and Commissioner Lamberts conspired as a team to revoke this license and to deny to Mr. Lewis his constitutionally protected rights.

Commissioner Lamberts testified longer than any other person at this trial, with the exception, perhaps, of Mr. Lewis. Generally, her testimony was evasive, insufficient, inconsistent, contradictory, and incredible. Her disregard for judicial process and constitutionally protected rights of others is incredulous and ruthless. The line of demarcation between fact and fiction in her testimony is very thin.

Her whole attitude toward this matter and toward judicial authority in general was clearly displayed during the exam-ination by the attorney for the Trustee in Bankruptcy, Mr. DeGroot. In answer to a question concerning the position of the City Attorney on procedure for the revocation hearings, Mrs. Lamberts replied that the City Attorney only makes "suggestions" and that the Commission sets its own rules.

To emphasize the sassy tone of her voice, she punctuated her answer by sticking out her tongue at the attorney. Her facial grimaces had occurred before this, when she was on and off the stand. By "Oh's" and "Ah's", she expressed visible approval or disapproval of the testimony of other witnesses. The court had permitted Commissioner Lamberts to demonstrate graphically her attitude without reprimand until this time, since this was a trial without jury.

The court is also aware of one time in the course of this trial when Commissioner Lamberts chose to demonstrate her omniscient attitude by expostulating that a certain question "was not worthy of answer." With this in mind, the court will delineate some of her testimony.

During the course of this transfer, Commissioner Lamberts said she talked with Chief Johnson often, as well as with other members of the Grand Rapids police. She recognized that animosity existed between Chief Johnson and Mr. Lewis. She heard that Mr. Lewis's attitude toward the police was most disrespectful.

She claimed that her own dislike of Mr. Lewis arose at the April 17 Safety Committee meeting when Mr. Lewis allegedly called Chief Johnson a liar, or said Chief Johnson was lying. The only reasonable inference from Commissioner Lamberts' testimony and attitude is that this was not the sole cause of her hatred for Mr. Lewis, but that something more was involved.

Her hatred for Mr. Lewis ante-dated April 17, 1962. She claims, however, part of her judgment against Mr. Lewis was based on what Chief Johnson told her.

It is apparent that Commissioner Lamberts and Chief Johnson pursued this

matter together after April 17, 1962, and that the interests and prejudices of one became the interests and prejudices of the other.

Commissioner Lamberts admitted that the police investigation form 1800 was never presented to the Safety Committee before its decision on July 31. She also acknowledged that the answers on the 1800 form as it now stands are inconsistent.

This witness talked to other Commissioners outside the regular hearings about Mr. Lewis, and conveyed her dislike to them. Commissioners Lamberts and Vanden Berg recalled, as did Chief Johnson, that the Chief gave reasons for disapproval in public hearings before July 31. Commissioner Lamberts did attempt to qualify her recollection by saying that everything that was discussed at the hearings was a reason for disapproval. This is hardly an answer to the question: "Why was the transfer disapproved at that time?"

Commissioner Lamberts refused to accept the information conveyed by the LCC to the Grand Rapids police on April 6 as an answer to the Safety Committee's questions, although Commissioner Barto, as Chairman, said that the letter did in substance answer their questions.

When the April 12 letter from Mr. Forell concerning the federal stop order was introduced, Commissioner Lamberts phoned Mr. Forell to check the tax position, because it appeared to be inconsistent with the April 6 letter which stated that the tax problem had been resolved. She said she wanted to find out if Mr. Lewis had lied to the LCC about the taxes.

Commissioner Lamberts admitted that the Committee discussed an escrow agreement arrangement for the payment of taxes at the time of the transfer.

Commissioner Lamberts stated that the Safety Committee requested the City Attorney to write the LCC concerning the violation of Rule 17 and Rule 31. She testified that "we wanted to close the bar."

In regard to the gambling charges against the Bar, Commissioner Lamberts said that Chief Johnson told her that a numbers operation was carried on at Barnett's Bar. She said she knew the court dismissed four of the six charged in the gambling, and that the prosecutor had petitioned for an order nolle prosequi for the other two. She maintained, however, that does not mean that gambling does not occur there. She stated that she chose to believe what Chief Johnson told her about the gambling.

Commissioner Lamberts agreed that neither Patricia Ettress Bell nor any attorney representing her had ever made a claim that Mr. Lewis had acted improperly in regard to the proposed transfer. Commissioner Lamberts herself never accused Mr. Lewis of faulty action at any Safety Committee or City Commission meeting at which Mr. Lewis was present.

The attorney for the Trustee pointed out that in the resolution calling for a show cause hearing on revocation, the Safety Committee stated that the Trustee was exerting no control over the license; that such lack of control on the part of the Trustee was a reason for the revocation. Commissioner Lamberts explained that by "no control" she believed the Trustee was not cooperating with the Safety Committee to the extent he should have done so.

At this time Commissioner Lamberts knew that the Trustee had tried to take possession of the license but that the order of the Referee had stayed any exertion of title until the petition for review had been heard. She insisted, however, that Mr. Lewis and the Trustee voluntarily place the license in escrow or have it revoked.

On April 29, 1963, the court granted plaintiff's petition for renewal of the license in the name of Patricia Ettress under the March 20, 1962 agreement and the power of attorney to Mr. Lewis. Pursuant to this court's order, the LCC renewed the license pending the outcome of this case.

On May 22, 1963, upon stipulation of the parties, an order was filed dismissing the United States as a party defendant.

A jurisdictional question must first be resolved: Does this court have jurisdiction to review the action of the Chief of Police, the Safety Committee, and the City Commission of Grand Rapids on the question of transfer and revocation of the license at Barnett's Bar?

The Michigan Constitution provides in Article XVI, § 11:

"The legislature may by law establish a liquor control commission, who, subject to statutory limitations, shall exercise complete control of the alcoholic beverage traffic within this state, including the retail sales thereof; * * *."

In accordance with this power, the legislature passed the Michigan Liquor Control Act, Public Act 8, 1933 (Ex.Sess.), M.S.A. §§ 18.971 to 18.1029, Comp.Laws 1948, §§ 436.1–436.58, and subsequent amendments. The state agency given the power to regulate and control the liquor business was the Liquor Control Commission. M.S.A. § 18.972(6), Comp.Laws Supp.1956, § 436.2f.

Michigan also has an Administrative Code, M.S.A. §§ 3.560(7)–3.560(18), Comp.Laws 1948, §§ 24.71–24.82, and an Administrative Procedure Act, M.S.A. §§ 3.560(21.1)–3.560(21.10), Comp.Laws Supp.1956, §§ 24.101–24.110. The latter describes the rights of the public in relation to procedure before state administrative agencies. The Administrative Procedure Act requires each agency to adopt rules governing formal and informal procedures relating to contested cases. Op.Atty.Gen., Feb. 27, 1953, No. 1595.

The Michigan Liquor Control Act delegates certain functions concerning the regulation of liquor to local units of government. The provision under which the Safety Committee of the City Commission of Grand Rapids necessarily acted in this case is M.S.A. § 18.988, Comp.Laws 1948, § 436.17, which provides in part:

" * * * Licenses may be transferred with the consent of the commission (Liquor Control Commission). * * * All applications for licenses to sell beer and wine or spirits for consumption on the premises, except in counties of 1,000,000 population or over, shall be approved by the local legislative body in which said applicant's place of business is located before being granted a license by the commission * * *."

■■ The local legislative body, the City Commission, is an arm of the state's administrative agency whenever it functions under this provision. Since an application for transfer is within the language of the above statute, it must be approved by the local body *before* the Liquor Control Commission can grant the license. The language is mandatory; a license cannot be granted without local approval.

Disapproval is equivalent to *denial* of a transfer because the local agency's approval is a condition precedent to a grant of transfer by the LCC.

The Legislature formulated rules for review of actions of the Liquor Commission. See M.S.A. § 18.991, Comp.Laws 1948, § 436.20. This is in keeping with the direction of the Administrative Procedures Act, which states:

"Any person aggrieved by a final decision in a contested case, whether such decision is affirmative or negative in form, is entitled to judicial review thereof under this act; but nothing in this section shall be deemed to prevent resort to other means of review, redress, relief or trial de novo, provided by law. * * *." M.S.A. § 3.560(21.8), Comp.Laws 1948, § 24.108.

A contested case is defined as follows:

" 'Contested case' means a proceeding before an agency in which the legal rights, duties or privileges of a specific party or specific parties are required by law or constitutional right to be determined after an opportunity for an agency hearing." M.S.A. § 3.560(21.1) (3), Comp.Laws 1948, § 24.101(3).

■ The parent administrative agency is by these laws required to proceed in a particular way, out of recognition for basic concepts of procedural fair play and due process. It is only reasonable to conclude that an agency subordinate to the parent agency, whose action controls in a denial, must be guided by similar concepts of fair play and due process.

■ Rights of persons appearing before a local governing body must be properly safeguarded and the traditional check is judicial review. Constitutionally protected personal rights must be secured to persons appearing before local administrative agencies.

■■ The statute declares the local administrative agency "shall approve" before the Commission can grant a license. "Approval" connotes discretion. Thus, the local agency may approve or disapprove according to the facts of the situation. This discretionary action may be challenged by judicial review as arbitrary, unreasonable, or unconstitutional.

The proposition is stated in 2 Am.Jur. 2d, Sec. 650, as follows:

"ARBITRARY, CAPRICIOUS, OR UNREASONABLE ACTION: ABUSE OF DISCRETION.

"Since such action is not in accordance with law, is in excess of authority, and presents a judicial question or a question of law for the court, a court on review of action of an administrative agency, under express provisions of some statutes but even in the absence of statutes providing for judicial review or relief and in the face of statutes purporting to preclude judicial review, this being a matter of constitutional right in some instances, will pass on, and in a proper case grant relief from or set aside, agency action, findings, and conclusions which are arbitrary, capricious, or both or either, unreasonable, or arbitrary or unreasonable, or an abuse of power of discretion * *

"Sometimes the courts use other terms to express the type of illegal action which is subject to review or reversal, namely, action which is unjust, discriminatory, or oppressive." 2 Am.Jur.2d, § 650.

■ The Michigan Supreme Court recognized this fundamental principle early in a well written opinion by Justice Campbell:

"It is undoubtedly true that no court can review the lawful discretion of any body that is not a court. * * *. But it is equally true that private rights cannot be subject by legislative, executive, or any other authority, to the unregulated discretion of any one. Legal rights can only be divested by such measures as are classed under the *law of the land as due process of law. * * * But in a constitutional government the action of all persons, official or private, which is in violation of constitutional rights, is simply null and void, and usually needs no reversal.*" Dullam v. Willson, 53 Mich. 392, 19 N.W. 112, 120 (1884). (Emphasis supplied.)

This is the essence of written limitations of constitutional government.

Justice Campbell declared the same proposition in People ex rel. Robison v. Miner, 68 Mich. 549, 37 N.W. 21 (1888).

In Sherlock v. Stuart, 96 Mich. 193, 55 N.W. 845, 21 L.R.A. 580 (1893), plaintiff sought mandamus against defendant Mayor of Grand Rapids. A city ordinance had given discretion to the City Common Council and the Mayor in determining the proper locations for licensed liquor establishments. The court found the ordinance clearly authorized under existing law and stated:

"When the mayor and council have in good faith exercised the discretion conferred upon them by the law, courts cannot review it. There is nothing in this case showing any abuse of discretion, or the arbitrary exercise of power." At page 847 of 55 N.W.

Glicker v. Michigan Liquor Control Commission, 160 F.2d 96 (CCA 6) is the leading and controlling case in this Cir-

cuit. In that case the district court dismissed plaintiff's complaint on defendant's motion. The Circuit Court of Appeals reversed.

Plaintiff in Glicker was the owner of a Class C license. The license was revoked for what plaintiff claimed were arbitrary and discriminatory reasons. Plaintiff asked for an order directing the defendant LCC to renew her license.

The Circuit Court of Appeals first agreed with the district court that the plaintiff had no cause of action under that portion of the Fourteenth Amendment which prohibits a state from enforcing any law which abridges the privileges or immunities of citizens of the United States. Judge Miller, speaking for the court, said:

> "The right to a license to sell intoxicating liquor is not a natural or fundamental right, nor a privilege incident to national citizenship. The regulation of the liquor traffic in any state is exclusively under the police power of that particular state. (Omitting cases cited.) * * * Accordingly, appellant's right to a license to sell liquor in Michigan is not protected by the privileges and immunities clause of the Fourteenth Amendment." At page 98 of 160 F.2d.

Judge Miller, however, clearly declared that the appellant had a proper complaint under the equal protection clause of the Fourteenth Amendment. He said:

> "The *equal protection* clause of the Fourteenth Amendment *is a right in itself*, separate and independent from the rights protected by the privileges and immunities clause of the Fourteenth Amendment. * * *

> "In Hartford Steam Boiler Inspection & Insurance Company v. Harrison, 301 U.S. 459, 57 S.Ct. 838, 839, 81 L.Ed. 1223, the Court pointed out that while the *Fourteenth Amendment* allows reasonable classification of persons, yet it *forbids unreasonable or arbitrary classification or treatment*, and wrote—'it may be

said generally that the equal protection clause means that the rights of all persons must rest upon the same rule under similar circumstances * * * and that it applies to the exercise of all the powers of the state which can affect the individual or his property, including the power of taxation.' In Sunday Lake Iron Company v. Township of Wakefield, 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154, the Court said * * * 'The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against *intentional and arbitrary discrimination* (U. S. Supreme Court's emphasis), whether occasioned by express terms of a statute *or by its improper execution through duly constituted agents.*' * * * Numerous other cases fully sustain the rule that the constitutional rights provided by the equal protection clause of the Fourteenth Amendment to a person within the state *are violated by intentional discriminatory* action against him on the part of the State, acting either *through its legislative body or by administrative action of its officials,* and that remedial action is provided therefor by Section 1979, Revised Statutes." Omitting cases cited. At pages 99–100 of 160 F.2d. (Emphasis supplied.)

The court then went on to recognize what the duties of the court were in regard to the action of the state agency.

> "While the Federal Government does not have the right to regulate such matters, which are exclusively under the control and regulation of the state, yet it does have the right, by virtue of the Fourteenth Amendment, to prevent such regulation from being arbitrary or discriminatory. * * * The rule is equally as applicable where the business or occupation being regulated is not a franchise or property right, *but is merely a privilege granted or with-*

380

*held by the state at its pleasure.*" (Emphasis supplied.) At page 100 of 160 F.2d.

Recognizing that the pleadings in the case admitted arbitrary and discriminatory action, the Circuit Court held that the complaint was sufficient and the district court should not have granted the motion to dismiss.

Plaintiff Lewis in this case has alleged in his complaint that the City Commission and the Superintendent of Police of Grand Rapids intentionally discriminated against plaintiff in disapproving the transfer of the license to plaintiff.

The first issue which the court must decide on review is whether the Safety Committee of the City Commission and Superintendent Johnson acted in an arbitrary, discriminatory, or unreasonable manner in disapproving this transfer.

 From the facts and evidence produced at the trial of this case, the court is compelled to find that the Safety Committee and Chief Johnson intentionally discriminated against plaintiff Lewis.

 Chief Johnson and Grand Rapids Police officers under his direction deliberately delayed processing the required LCC form 1800 and refused to state reasons for their intentions to recommend denial of the transfer. They acted with deliberate delay instead of due diligence. This delay is discrimination in disguise.

In review of his testimony under the facts of this case, this court has found the controlling motives of Chief Johnson's and Commissioner Lamberts' actions were hate and malice.

It is clear that local administrative agencies under the Michigan Liquor Control Act heavily rely upon the recommendations of staff police officers. In the present instance, the Safety Committee and the City Commission relied to a controlling degree upon the alleged facts received from Chief Johnson and Commissioner Lamberts, as well as upon their recommendations.

In the April 17 Safety Committee meeting, Commissioner Lamberts was joined by Commissioner Sevensma in the intentional delay advocated by Chief Johnson. *The intentions of Commissioners Lamberts, Sevensma, Jamo, and Chief Johnson came into clear evidential focus from April 1962 through and including* the actual trial of this case.

In April the application for transfer was in a posture for completion. The Lewis-Patricia Ettress Bell difficulties were resolved. It is important to note that Mr. Lewis became a prospective transferee purchaser only after attempts to sell the license to others failed. Unpaid taxes could be resolved through escrow, and gambling charges had been dismissed. The LCC investigation was completed, and approval was indicated.

But for the unconstitutional and capricious conduct of certain city commissioners and Chief Johnson, this Barnett's Bar license would have been transferred within a reasonable time after April 17, 1962.

Thereafter, Chief Johnson *instigated* a new LCC investigation solely for the purpose of delay. This and all of the preceding activities were discriminatory. They were intended to deny the transfer of the license to Mr. Lewis and Dr. English without declaring legitimate reasons, or any reasons at all. This would be to the detriment of not only Mr. Lewis and Dr. English, but also to the detriment of Patricia Ettress Bell.

Commissioner Lamberts claimed Mr. Lewis was disrespectful toward police officers in court. The testimony of the prosecutor, Mr. Richard Loughrin, is to the contrary. Commissioner Lamberts never saw Mr. Lewis try a case until this transfer issue came before the Safety Committee. Then she attended court trials just to watch Mr. Lewis in action as an attorney.

She disliked his insistence upon due process, open hearings, confrontation of witnesses, constitutional rights, declarations of reasons for delay by Chief Johnson and the Police Department, and reasons for denial of the transfer by the Safety Committee and the City Commission. Her dislike for Mr. Lewis caused

her to pursue every channel of authority conceivable to her to defeat transfer and to close Barnett's Bar. When she phoned the LCC she misrepresented certain important facts when she told them there was going to be a grand jury investigation of this transaction.

She went so far as to seek an investigation by a school official of Mr. Lewis's wife, a school teacher, when Mrs. Lamberts heard that Mrs. Lewis had claimed in the presence of her students that this transfer had been disapproved for discriminatory reasons.

There are only three liquor establishments in the City of Grand Rapids owned by negroes: the Lamar hotel license, a club license; the Crispus Attucks Post of the American Legion, available for service to members only; and Barnett's Bar.

All three of these liquor establishments are located in Commissioner Lamberts' ward. She wanted Barnett's Bar closed. She intended to eliminate the only Class C liquor license owned by a negro in the City of Grand Rapids, a city of over 200,-000 population.

She sent a telegram to Attorney General Frank Kelley when it appeared that the Referee in Bankruptcy intended to enjoin city officials from communicating to the LCC their attempted revocation action. She used this channel as a means to get the information to the LCC, just as she used the channel of the legal adviser to Governor to force indirectly the LCC to do the bidding of the City Commission of Grand Rapids, which was under her dominating control insofar as this transaction was concerned.

Commissioner Lamberts had obtained a position of power and substantial influence in the City Commission. Her rise to Chairman of the Safety Committee and President of the City Commission, and the evident voting bloc which she had acquired in the City Commission, gave her substantial power, which she wielded arbitrarily, capriciously, and unreasonably in this instant case.

The recommendations of Chief Johnson and Commissioner Lamberts to the Safety Committee and to the City Commission withheld facts and presented distorted facts which were corrupted by malice and hatred. The facts presented in this manner thus permeated the entire action of the Safety Committee and the City Commission in each of its votes on the questions presented by the problems of the application for transfer involved in this case.

Commissioner Barto neglected to pursue his previously expressed dissatisfaction with the Safety Committee's and the Commissioners' denial of due process, as well as with their disapproval of the transfer subject to escrowing the taxes. He also neglected to pursue his previously expressed dissatisfaction with the change made in the Form 1800 from "Yes" to "No," and with the failure of the Police Department to state reasons for this change.

Commissioner Sypniewski went along indifferently with the other Commissioners who were following the leadership of Commissioner Lamberts and of Chief Johnson. The tide of resentment engendered against Barnett's Bar and Alphonse Lewis by Chief Johnson and Commissioners Lamberts, Jamo, Sevensma and Vanden Berg was of sufficient momentum to sweep Commissioners Barto and Sypniewski behind the leadership of Commissioner Lamberts and Chief Johnson.

From the beginning to the end of the proceedings before the Safety Committee and the City Commission, all of the Commissioners, except the Mayor, participated in a conspiracy of silence.

Commissioner Vanden Berg testified that this silence was to insure Mr. Lewis freedom from embarrassment. Such testimony can be accorded little weight in light of plaintiff Lewis's insistence not on secrecy but on open hearings; not on silence but on testimony of live witnesses; not on hiding facts involved in this case but in revealing facts. He was willing to submit himself to cross-examination, but he also wished to cross-examine those who were uttering whispered innuendoes and calumny behind his back.

He called for due process and constitutional rights. Chief Johnson and Commissioners Lamberts, Jamo, Sevensma, and Vanden Berg denied due process and constitutional rights.

Historically, secrecy frequently has been used to intimidate individuals and to destroy careers and reputations in civil society. In the present case secrecy and silence as to the real reasons for denying the transfer of the license created distorted images in the public means of mass communication. Mr. Lewis, Barnett's Bar, and all who were associated with it, were made to appear to represent all that was undesirable in taverns and licensed liquor establishments, and especially, with varying inflections of overtone, a negro bar.

This is not secrecy of freedom but secrecy of tyranny. It is a secrecy which destroys rather than protects human rights.

This court finds as a matter of fact that the Safety Committee, the City Commission, and the Chief of Police studiously avoided stating reasons in public session in the presence of Mr. Lewis, Dr. English, or Patricia Ettress Bell for the unreasonable and unwarranted delay in the processing of form 1800 and for failure to approve transfer of the license.

This failure casts a shadow of doubt over the legitimacy and the veracity of their later declared reasons, and creates a presumption against the integrity of the stated post factum reasons.

To further this secrecy, they sought out the advice of the City Attorney, thus conspiring together "under the color of law" to deny both to plaintiff Lewis and to Patricia Ettress Bell due process and equal protection of the law. In this regard they violated the Federal Civil Rights Act, Title 42 U.S.C. §§ 1981, 1982 and 1983.

It is interesting to note that the Commissioners picked and chose the advice of the City Attorney. They followed him on his advice in regard to secrecy, but they disregarded his advice on the question of the legality of a non-resident owner of a tavern license, and on the question of the legality of the bar being open from twelve o'clock to two o'clock on Monday mornings.

It is important to bear in mind that insofar as the negro population of the City of Grand Rapids is concerned, it comprises about 7% of the population. In Commissioners Lamberts' and Jamo's political calculation this was a negligible force which could be disregarded. Their activities in the case here at issue were before Birmingham.

The court's discussion of the gambling charges need not be repeated here. The action of the city police in this regard, however, constituted a discriminatory enforcement of the gambling laws against a licensed liquor establishment.

Commissioner Sypniewski testified that he, as a citizen, had observed violations of the gambling laws in other licensed premises in the City of Grand Rapids. Yet, the only instance in which an attempted revocation or denial of a transfer of a license via alleged gambling-law violations in at least sixteen years is Barnett's Bar. Chief Johnson could testify to no other raid on a licensed establishment in his years of experience on the police force.

The net effect is that the action of Chief Johnson, of the Safety Committee, and of the City Commission in relation to this transaction has been arbitrary, capricious, unreasonable, and unconstitutional. It was discriminatory both racially and personally. There existed in fact a conspiracy on the part of Chief Johnson and Commissioners Lamberts, Sevensma, and Jamo to defeat and deny the transfer, and ultimately to revoke the only negro-owned Class C liquor license in a city of over 200,000 population.

The instant case is one of invidious discrimination. See Skinner v. Oklahoma, 316 U.S. 535–547, 62 S.Ct. 1110–1116, 86 L.Ed. 1655, at page 1660; Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563; Baker v. Carr, 369 U.S. 186, 8 S.Ct. 691, 7 L.Ed.2d 663; Sanders v. Gray, D.C., 203 F.Supp. 158, reversed 372

U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); and Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965.

 Since the only reason given at a public hearing in the presence of Mr. Lewis, Dr. English, or Patricia Ettress Bell at any time up to and including the date of denial of the transfer by the City Commission on July 31, was failure to pay taxes as evidenced by Chief Johnson's reference to the Forell letter and recommendations of the police department, the court ruled as inadmissible in the principal case the post factum reasons given by the Commissioners in their testimony.

Since, however, these reasons were made a part of a segregated record and since they may be considered only insofar as they relate to the segregated record, the court has commented upon these facts merely to disclose the transparency of these reasons and to add substance to the finding of the court that Chief Johnson, the Safety Committee, and the City Commission acted arbitrarily. These reasons, even if admitted as evidence, are a facade for the real reasons behind the action of the Safety Committee and the personal and racial discrimination of Chief Johnson.

It is worthy of note that Barnett's Bar and the transfer of the license to Alphonse Lewis became a cause celebre in the City of Grand Rapids. Mass means of communication—radio, TV and newspapers—covered the sessions of the Safety Committee. Stories appeared frequently in the news media so extensively —and it was the purpose of Chief Johnson and Commissioner Lamberts to cause this result—that Barnett's Bar became synonymous with all that is undesirable in liquor establishments, and especially in a negro-owned-operated liquor establishment. Barnett's Bar and Alphonse Lewis as a consequence are unpopular in this community.

It is not unreasonable to conclude that the impressions thus created in the City of Grand Rapids and its environs of Barnett's Bar, of Alphonse Lewis, and of Patricia Ettress Bell, are such that if a popular vote were held on the question, "Shall Barnett's Bar license be revoked?" the vote would be overwhelmingly in the affirmative.

Unbridled discretion in public authorities lends itself to selective enforcement against unpopular causes.

The court cannot close its eyes to the fact that militant demands of the negroes have engendered unpopularity and resistance by certain officials. Alphonse Lewis was militant in his insistence upon constitutional rights. This militancy was vigorously resented. In such circumstances, discriminatory action may easily become the fashion of operation.

Unbridled administrative acts may well freeze out the existence of all activities on behalf of the social and civil rights of negroes. NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405.

The City Commission claims that its action on the applications for transfer of the liquor license is a privileged exercise of police power. It is their contention that they may deny such applications without stating reasons for such denial.

 The police power of the state or any of its agencies is not a sanctuary from which constitutionally protected rights of citizens may be violated with impunity.

 The police power of the state is not a license to ignore the constitutionally protected rights of equal protection of the law, of equal enforcement of the law, and of due process of law.

 What Judge Miller said (160 F.2d at page 100) in the Glicker case may be paraphrased: It is well settled that under the decisions of the United States Supreme Court a state police regulation is, like any other law, subject to the equal protection clause of the Fourteenth Amendment.

 The City may not under the guise of protection of the health and welfare of the city, ignore these fundamental, constitutionally protected rights.

While it would be sufficient for this court to rest its opinion on the finding of

384

denial of equal protection of the law, and thus, a violation of a constitutionally protected right of the Fourteenth Amendment, the court is compelled to further hold that the method of disapproval of the transfer was a denial of due process.

The logic of equal protection of the law in the instant case compels the requirement of fair procedural practice.

■ The very logic of the constitutional doctrine of equal protection under the law in cases of this kind compels conclusions that the aggrieved party in a contested case must be guaranteed procedural due process of law. This is an ancient doctrine, older than the writings of Henry Bracton, Lord Mansfield, or Blackstone.

It is first difficult to find the denial of one right here without the denial of the other because of the circumstances. In Truax v. Corrigan, 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254 (1921), plaintiff claimed that a certain statute denied him equal protection of the laws and violated due process. Chief Justice Taft discussed the equal protection clause and said:

"The clause is associated in the Amendment with the due process clause and it is customary to consider them together. It may be that they overlap, that a violation of one may involve at times the violation of the other, but the spheres of the protection they offer are not conterminous." At pages 331, 332 of 257 U.S., at page 129 of 42 S.Ct., 66 L. Ed. 254.

The course of decisional law and the constitutional history of the Fourteenth Amendment demonstrate the verity of this proposition.

We recognize that the Michigan Supreme Court and the courts of the other states have held consistently that the due process clause of the United States Constitution does not apply to matters concerning liquor licenses.

Various reasons for this position have been given. Licensees are said to have no vested interest in their license. People v. Schafran, 168 Mich. 324, 134 N.W. 29 (1912); Case v. Michigan Liquor Control Commission, 314 Mich. 632, 23 N.W.2d 109; Fitzpatric v. Liquor Control Commission, 316 Mich. 83, 25 N.W.2d 118, 172 A.L.R. 608; or the court holds that a license is merely a "privilege" and not property. Johnson v. Liquor Control Commission, 266 Mich. 682, 254 N.W. 557. And the Michigan courts have flatly stated that the exercise of the state's power in regard to liquor licenses is not affected by the Fourteenth Amendment. People v. Wheeler, 185 Mich. 164, 151 N.W. 710; Gamble v. Liquor Control Commission, 323 Mich. 576, 36 N.W.2d 297.

The recent trend in the area of due process convinces this court that technical classification of rights relating to licenses is not an answer to the broad protection intended by the drafters of the Constitution. Some courts have squarely met this problem by saying:

" 'State law,' the court explained (referring to Morgan v. Commissioner, 309 U.S. 78, 60 S.Ct. 424, 84 L. Ed. 585) 'creates legal interests and rights. The federal revenue acts designate what interests or rights, so created, shall be taxed. Our duty is to ascertain the meaning of the words used to specify the thing taxed. If it is found in a given case that an interest or right created by local law was the object intended to be taxed, the federal law must prevail no matter what name is given to the interest or right by state law.' " Fidelity & Deposit Company of Maryland v. New York City Housing Authority, 241 F.2d 142 (CCA 2, 1957).

See also In re Halprin, 280 F.2d 407 (CCA 3, 1960).

■ The Federal Constitution, as interpreted by the United States Supreme Court, designates the rights which shall be protected. It is the duty of this court to determine whether the right here involved was intended to be protected.

The United States Supreme Court has had a recent opportunity to comment on

this issue. Sherbert v. Verner, supra. Plaintiff in that case filed a claim for unemployment benefits since she could not find employment due to her refusal to work on Saturdays according to her religious convictions. The unemployment statute provided that the claimant must be available for work and must accept work offered except for good cause. The employment commission found that plaintiff's restriction upon her availability for Saturday work brought her within the disqualifying provision for failing to accept, without good cause, available work.

Plaintiff claimed that this disqualifying provision worked to deny her freedom to exercise her religion secured by the First and Fourteenth Amendments. In regard to the defense of this claim, Justice Brennan, writing for the majority, stated:

"Nor may the South Carolina court's construction of the statute be saved from constitutional infirmity on the ground that unemployment compensation benefits are not appellant's 'right' but merely a 'privilege.' *It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of placing of conditions upon a benefit or privilege.* * * *

"For example, in Flemming v. Nestor, 363 U.S. 603, 611 [80 S.Ct. 1367, 4 L.Ed.2d 1435, 1444], *the Court recognized with respect to Federal Social Security benefits that '(t)he interest of a covered employee under the Act is of sufficient substance to fall within the protection from arbitrary governmental action afforded by the Due Process Clause.*" (Emphasis supplied.) (374 U.S. 398, at pages 1794-1795 of 83 S.Ct., at page 971 of 10 L.Ed.2d.)

This case involves a transfer proceeding, concerning the license held by the transferor—worth at least $18,000—and a transferee desirous of pursuing this lawful occupation, and willing to pay for the license. Certainly we are speaking in matters of substantial substance. On the one hand we are speaking about a license, called a privilege only; but it has an acknowledged dollar value of $18,000. On the other hand we are speaking about the liberty and freedom of a citizen to pursue a lawful, though regulated, occupation.

The sale by one party of the use of this license can under certain circumstances be imminent. In this case the transferor was in financial difficulty. The settlement obtained in the Kent County Circuit Court case had in mind avoidance of bankruptcy by the transferor.

The purchase by the other party also carried grave implications. Part of the purchase price involved money owed by the transferor to the transferee—and the only asset of any value of the transferor was the liquor license. To destroy that license was in effect to destroy the debt.

To deny the transfer without due process, on the ground that a privilege only, and not property is in issue, is to close the eyes of justice to realities. Other courts have overcome this court-made hurdle.

The District Court in Midwest Beverage Co., Inc. v. Gates, 61 F.Supp. 688 (N.W.Ind.) (1945), went so far as to call a liquor license property. Even when faced with a state statute to the effect that a license was not a property right, the court stated:

"*While a permit or license as such may not be property, the use and enjoyment of it may give to its possessor something that is valuable and which has all the qualities of property.* * * * On the other hand *the use of the permit, once granted, has the elements of property irrespective of what the Legislature may declare about the permit itself, and except for the omnipresent and unlimited power of the state to revoke or modify the terms of the permit in the interest of the public welfare, the use of such permit, if not the permit itself, is property within the meaning of the due process clause of the Federal Constitution.*" At page 691 of 61 F.Supp. (Emphasis supplied.)

The New Jersey Supreme Court in a very recent case, The Boss Co., Inc. v.

Board of Commissioners of Atlantic City, 40 N.J. 379, 192 A.2d 584, held that for federal tax liens, a liquor license was "property". The court is quoted as saying:

"This *license has value*—not merely the personal value to the licensee that inheres in the right to engage in the business of selling intoxicating liquors, *but also the monetary value that arises from the power possessed by the licensee to substitute, with the municipal consent, some other person in his place as licensee.* \* \* \* *Thus, the liquor license is a legal interest in the nature of an economic asset, created and protected by statute,* and because it has monetary value and is transferable, either by consent of the licensee or by operation of law \* \* \* *it possesses the qualities of property."* 192 A.2d 584, at pages 586–587. (Emphasis supplied.)

So long as it is legal to engage in licensed liquor traffic, and, so long as such licenses have a substantial monetary value, their transfer cannot be denied without due process of law.

It must be remembered also that the due process clause demands that no state shall deprive any person of his "liberty" without due process. The United States Supreme Court, as quoted by the Michigan Supreme Court, said long ago that:

" 'Liberty is something more than mere freedom from physical restraint. *It means freedom to go where one may choose, and to act in such manner, not inconsistent with the equal rights of others, as his judgment may dictate for the promotion of his happiness; that is, to pursue such callings and avocations as may be most suitable to develop his capacities, and to give them their highest enjoyment.'* " People ex rel. Kuhn v. Common Council, 70 Mich. 534, 38 N.W. 470 (1880), quoting from Justices Field and Strong in Munn v. Illinois, 94 U.S. 113, 142, 24 L.Ed. 77. (Emphasis supplied.)

Liberty includes the right to pursue a lawful occupation. To prevent this without due process is to violate the Fourteenth Amendment to the United States Constitution.

The right to liberty inheres in the very nature of man; it is superior to the right to property, which is a derivative right.

As recently as May 13, 1963, the Supreme Court has ruled on this important due process issue. In Willner v. Committee on Character and Fitness, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224, plaintiff was denied admission to the New York Bar. After a complex procedural process, and a ruling by the highest New York court, the Supreme Court granted certiorari to determine whether or not appellant had been denied due process of law.

The Court of Appeals of New York had ruled that appellant was not denied due process.

The Supreme Court stated in its opinion through Justice Douglas:

"The issue presented is justiciable. 'A claim of a present right to admission to the bar of a state and a denial of that right is a controversy.' In re Summers, 325 U.S. 561, 568 [65 S.Ct. 1307, 89 L.Ed. 1795]. Moreover, the requirements of procedural due process must be met before a State can exclude a person from practicing law. 'A State cannot exclude a person from the practice of law *or from any other occupation* in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment.' Schware v. Board of Bar Examiners, 353 U.S. 232, 238–239 [77 S.Ct. 752, 1 L.Ed.2d 796]. As the Court said in Ex parte Garland, 4 Wall. 333, 379 [18 L.Ed. 366], the right is not 'a matter of grace and favor.'

"We are not here concerned with grounds which justify denial of a license to practice law, but only with what procedural due process requires

if the license is to be withheld. This is the problem which Chief Justice Taft adverted to in Goldsmith v. United States Board of Tax Appeals, 270 U.S. 117 [46 S.Ct. 215, 70 L.Ed. 494], involving an application of a certified public accountant to practice before the Board of Tax Appeals. Chief Justice Taft writing for the Court said:

"'We think that the petitioner having shown by his application that, being a citizen of the United States and a certified public accountant under the laws of a State, he was within the class of those entitled to be admitted to practice under the Board's rules, he should not have been rejected upon charges of his unfitness without giving him an opportunity by notice for hearing and answer. The rules adopted by the Board provide that "the Board may in its discretion deny admission, suspend or disbar any person." But this must be construed to mean the exercise of a discretion to be exercised after fair investigation, with such a notice, hearing and opportunity to answer for the applicant as would constitute due process.' Id. [270 U.S.] at p. 123 [46 S.Ct. at p. 217, 70 L.Ed. 494]." 373 U.S. 96, 83 S.Ct. at pages 1179–1180, 10 L.Ed. 2d at page 229. (Emphasis supplied.)

It was claimed by the defendant that the petitioner was rejected by the Board on the basis of his own statements to the Committee. The Supreme Court remarked:

"It does not appear from the record that either the Committee or the Appellate Division, at any stage of these proceedings, ever apprised petitioner of its reasons for failing to be convinced of his good character. Petitioner was clearly entitled to notice of and a hearing on the grounds for his rejection either before the Committee or before the Appellate

Division. * * * There seems no question but that petitioner was apprised of the matters the Committee was considering. 'But a "full hearing"—a fair and open hearing—requires more than that * * * Those who are brought into contest with * * * Government in a quasi-judicial proceeding aimed at the control of their activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command.' Morgan v. United States, 304 U.S. 1, 18–19 [58 S.Ct. 999, 82 L.Ed. 1129]." 373 U.S. 96, 83 S.Ct. at page 1181, 10 L.Ed.2d at page 230.

■ Most City Commissioners in this case based their action on hearsay complaints against Mr. Lewis. Due process required that Mr. Lewis's right of confrontation be protected. Denial of the right of confrontation violated due process as set forth in the Fourteenth Amendment. Willner, supra, 373 U.S. 96, 83 S. Ct. pages 1180–1182, 10 L.Ed.2d page 230–231.

The Court concluded by holding:

"* * * that petitioner was denied procedural due process when he was denied admission to the Bar by the Appellate Division without a hearing on the charges filed against him before either the Committee or the Appellate Division." 373 U.S. 96, 83 S.Ct. at page 1181, 10 L.Ed. 2d at page 231.

■ Although Mr. Lewis insisted upon due process, confrontation and a declaration of reasons, Mr. Lewis was never informed of the specific reasons for the disapproval and denial of the transfer of the liquor license to himself and Dr. English. They were never given an opportunity to formally challenge the ex post factum purported reasons. For these reasons alone, Mr. Lewis was denied procedural due process.

Justice Goldberg, concurring in the Willner case, supra, stated 373 U.S. 96,

83 S.Ct. at page 1183, 10 L.Ed.2d at page 233:

> "*Moreover, at no point are we or the petitioner specifically advised by any finding of the committee or of the state courts as to the precise basis of denial to him of either his original or renewed applications for admission or his requests for reconsideration thereof.*" (Emphasis supplied.)

Whenever an aggrieved person demands a hearing on the denial of an application for a transfer, he must be accorded procedural due process. Dation v. Ford Motor Co., 314 Mich. 152, 22 N.W. 2d 252; Napuche v. Liquor Control Commission, 336 Mich. 398, 58 N.W. 118; Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288; Willner v. Committee on Character and Fitness, supra.

The action of the Safety Committee and the City Commission on July 31, 1962 denying the transfer of the license from Patricia Ettress Bell to Alphonse Lewis and Dr. English is void.

The license continued to exist subject to the pending application for transfer to Mr. Lewis and Dr. English. By reason of the unconstitutional action of the City Commission and the Safety Committee, Mr. Lewis continues to operate the Bar to date under the March 20, 1962 agreement and the power of attorney.

On September 10, 1962, Patricia Ettress Bell, the licensee, filed a voluntary petition in bankruptcy.

On October 15, 1962, Mr. Lewis and Dr. English were ordered to show cause why the Trustee in Bankruptcy, Mr. Nichols, should not be declared the owner of the license. A hearing was held and on November 1, 1962, the Referee entered an order containing findings of fact and conclusions of law to the effect that the Trustee was the owner of the liquor license.

Mr. Lewis filed on November 7, 1962, a petition for review of this order. The petition is presently before the court by agreement of the Trustee and Mr. Lewis,

entered into at a conference with the Court on August 5, 1963.

The findings of the Referee necessarily included a finding that the proposed transfer of the license to Mr. Lewis and Dr. English had been denied by the disapproval of the local legislative body. The present finding by this court that the action of the body was void does not change the status of the license ownership.

At all times before disapproval of the transfer and bankruptcy, Patricia Ettress Bell was the named licensee. True, Mr. Lewis had a substantial financial interest in the Bar, and therefore, in the license. Monies were expended by him in procuring the license for Mrs. Bell; but at no time was Mr. Lewis the licensee, as is evidenced by his attempt to secure a transfer of the license to himself and Dr. English. No party can become a licensee without the consent of the LCC. The unconstitutional action of the City Commission prevented the transfer from being presented to the LCC for its consent. The sole owner was Patricia Ettress Bell, succeeded by the Trustee.

The findings of fact and conclusions of law of the Referee are affirmed with the exception of those findings relating to the action of the local administrative agency.

However, since the action of the local administrative agency was void, the license became the Trustee's, still subject to the lawfully pending transfer to Mr. Lewis and Dr. English.

The Michigan Liquor Control Act states that approval by the local body must precede the grant by the LCC. It also states that transfers may be made with the consent of the LCC. M.S.A. § 18.988.

By virtue of this opinion, the transfer must now be treated as approved by both the local legislative body and by the Grand Rapids police. Before the application for transfer can be effective, the LCC, in the exercise of its discretion, must first consent to the transfer.

This brings the court to the final matter of consideration in this drawn-out

transfer proceeding. After four hearings before the Safety Committee, the Committee on November 14, 1962, moved that the license be placed in escrow by November 20, 1962 by the Trustee and Mr. Lewis or be revoked. The true legal interests of the parties at that time were as set out in this opinion—the Trustee is the owner of the license subject to the transfer pending to Mr. Lewis and Dr. English and the March 20, 1962 agreement.

Both Mr. Lewis in his complaint, and the Trustee in his position as cross-plaintiff, have alleged that the revocation hearings denied them due process of law. The Michigan statute in regard to revocation provides:

"* * * Upon request of the local legislative body in any county of less than 1,000,000 population, *after due notice and proper hearing by the body*, the commission shall revoke the license of any licensee granted a license to sell beer and wine or spirits for consumption on the premises." M.S.A. § 18.988, as amended by Public Acts 1957, No. 275, effective Sept. 27; and Public Acts of 1960, No. 151, effective May 23. (Emphasis supplied.)

Again, it can be seen that the action of the legislative body is a mandate to the Commission—"The commission *shall* revoke." "Due notice and proper hearing" is the statutory requirement of due process.

Without setting out again all the cases declaring what a "proper hearing" is within the demands of due process, see the Willner case, supra. It is enough to state the following proven facts concerning the revocation hearings.

■ The first revocation hearing was held October 16. There was no reporter present, and no record made, so the court is not informed whether or not procedural due process was accorded *at this hearing*. The absence of a record is a denial of due process.

Morgan v. United States, supra, 298 U.S. 480–481, 56 S.Ct. 911, 80 L.Ed. 1288, in discussing the meaning of the statutory provision "full hearing" points out:

*"The requirement of a 'full hearing' has obvious reference to the tradition of judicial proceedings in which evidence is received and weighed by the trier of the facts. The 'hearing' is designed to afford the safeguard that the one who decides shall be bound in good conscience to consider the evidence, to be guided by that alone, and to reach his conclusion uninfluenced by extraneous considerations which in other fields might have play in determining purely executive action. * * * But there must be a hearing in a substantial sense."*

The Michigan Supreme Court in Dation v. Ford Motor Co., supra, quoting with approval from Hunter v. Zenith Dredge Co., 220 Minn. 318, 19 N.W.2d 795, 799, said:

"'*Due process requires that the evidence on which an agency, board, or commission bases its findings be ascertainable. This court must have the necessary data on which to determine the correctness thereof.'*"

At the request of the Safety Committee, the City Attorney sought to advise the Committee regarding the procedure to be followed in the revocation hearings. He put his position in a letter dated October 11, 1962. While the letter does not state specifically that a record should be made, it sets out a procedure parallel to that followed in the courts—presentation of evidence, cross-examination, and a decision based on facts and findings.

At the second revocation hearing on October 24, no reporter was present, but a few notes were taken by the secretary of the City Attorney. Again, no record is a violation of due process.

At the third revocation hearing on November 7, a court reporter was furnished by the Safety Committee. It appears

that the reporter for the final hearing on November 13 was furnished by Mr. Lewis.

The most serious denial of due process in these hearings resulted from another action of the Committee. At the close of the November 7 hearing, Mr. Lewis was not finished with his cross-examination of Mr. Arens. At the close of that hearing the Committee considered Mr. Arens under subpoena for the hearing on November 13. According to the record before the court, very little time was accorded Mr. Lewis for cross-examination of the witness at this hearing.

Mr. Arens did not appear at the November 13 hearing. Both Mr. Lewis and Mr. DeGroot, attorney for the Trustee, stated they had further questions for him.[6] No further opportunity was afforded for cross-examination of Mr. Arens.

At the November 13 hearing, Mr. Lewis was allowed to cross-examine Chief Johnson. A time limit was placed on the hearing, as it was on the November 7 hearing. Although Mr. Lewis stated that he had witnesses present he wished to present, the hearing was adjourned without affording him the opportunity to do so. Time was never made available for the Trustee's attorney to cross-examine witnesses present, or present evidence he may have had relating to this license.

 These hearings therefore denied due process to Mr. Lewis and the Trustee, Mr. Nichols, in that: no record was made at two of the hearings; the right of cross-examination was substantially ignored; and the right to present evidence was fully ignored.

By resolution dated November 13, the Safety Committee recommended that the license be placed in escrow by November 20 or be revoked. At the time of this resolution, the Safety Committee knew that the Trustee was under a stay order from the Referee in Bankruptcy preventing him from taking any action in regard to this license.

 Escrow is a voluntary arrangement by the licensee; the Safety Committee had been told this directly by the LCC. Revocation can be requested by the local legislative unit upon the exercise of its discretion. This discretion may not be abused. Revocation cannot be requested as an ultimatum to an order by the Committee to place the license in escrow.

 Revocation must have a basis in fact, and these facts must be ascertainable. A record must be made before there can be any semblance of a "proper hearing". Cross-examination must be allowed. It is enough at this point to quote the Supreme Court in the Willner case, supra:

"*We have emphasized in recent years that procedural due process often requires confrontation and cross-examination of those whose*

6. "Mr. Vanden Berg: What are your plans?
"Mr. Lewis: First to restate some of the notes I have here and then to continue cross-examination of Mr. Arens. That was my original plan, and go into some questions with the Chief of Police.
　＊　　＊　　＊　　＊　　＊
"Mr. Miller: (City Attorney) I suggest we ignore the testimony of Mr. Arens of last week and Mr. Lewis be given the opportunity to proceed.
"Mr. Lewis: I certainly do not agree to that procedure.
"Mrs. Lamberts: I move we follow the procedure suggested by the City Attorney.

"Mr. Lewis: You feel you are able to throw out of your mind all of Mr. Arens' testimony, the majority of which was in answer to questions from you?
"Mrs. Lamberts: My motion is we proceed to disregard the testimony of Mr. Arens and Mr. Lewis be allowed to proceed to ask questions of the Police Chief and Lt. Szumski relative to this question of revocation.
"Mr. Vanden Berg: I think I will have to agree with Mr. Lewis. We might be able to do this but this testimony has been imbedded in our minds and will influence us. ＊　＊　＊"
(Tr. pp. 7-8)

*work deprives a person of his livelihood. \* \* \* We think the need for confrontation is a necessary conclusion from the requirements of procedural due process in a situation such as this."* 373 U.S. 96, 83 S.Ct. at page 1180, 10 L.Ed.2d at pages 229–230.

▪ The action of the Safety Committee requesting revocation of the liquor license for Barnett's Bar through the City Commission is void for denying due process to Mr. Lewis and the Trustee.

For the reasons stated in this opinion, the revocation of the license by the City Commission denied to Patricia Ettress Bell, to the Trustee, Mr. Nichols, and to Mr. Lewis, equal protection of the law.

The motions remaining to be ruled on may be disposed of quickly. The motion to dismiss of defendants City of Grand Rapids and Superintendent of Police, William A. Johnson, filed April 2, is denied.

The jurisdictional ground was ruled on at the trial. Not a partnership, but an individual has claimed a violation of constitutional rights.

▪ In this court's opinion, plaintiff has no adequate administrative remedy; and if so the court would not require its exhaustion. McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed. 2d 622.

The motion filed by these defendants June 12 raises no questions not answered in this opinion, and is, therefore, denied.

The motion to dismiss of the LCC filed November 30 and subsequently renewed, is granted. The complaint and proofs fail to make any claim upon which relief can be granted.

The facts in this opinion are to be considered as findings of fact and, the law conclusions of law within the meaning of Rule 52(a) of the Federal Rules of Civil Procedure.

It is ordered that the City of Grand Rapids, through its constituted officials, approve the transfer of the license at Barnett's Bar and Lounge to Mr. Lewis and Dr. English.

It is ordered that the Chief of Police cause his investigation form 1800 to be filed with the LCC, showing recommendation of the transfer to Mr. Lewis and Dr. English.

It is ordered that the findings of the Referee in Bankruptcy concerning the ownership of this license be affirmed, with the noted exception.

It is further ordered that the defendants William A. Johnson and the City of Grand Rapids, its city commissioners, any officials, agents or employees, or any other person or persons acting for, with, or in concert with city officials, or any agent or employee of the City of Grand Rapids, are severally and individually enjoined from directly or indirectly interfering with the transfer of the liquor license involved in this case; or from directly or indirectly using any fruits from any conspiracy among themselves, or with any other person or persons, as a means of preventing the transfer of the Class C liquor license from Patricia Ettress Bell, through the Trustee in Bankruptcy, William Nichols, to Alphonse Lewis, Jr. and Dr. Cortez English, during the pendency of this litigation and/or during the pendency of the application for transfer before the LCC of the State of Michigan; and from communicating in any way with the LCC, or any of its officers, agents, or employees, except as is provided by law and as is in accordance with due process and fair procedural practice.

APPENDIX I.

CONTRACT AND AGREEMENT

This contract and agreement entered into this 20 day of March, A.D. 1962, by and between Alphonse Lewis, Jr., hereinafter known as first party, and Patricia Ettress, hereinafter known as second party, WITNESSETH:

WHEREAS, the parties hereto have heretofore been involved in various con-

tracts relating to the operation of a Class C Liquor License under the name and style of Barnett's Bar & Lounge and

WHEREAS, second party is indebted to first party for monies loaned, chattel mortgages, management fees and legal fees, and

WHEREAS, first party has filed a suit against second party in the Circuit Court for the County of Kent,

NOW, THEREFORE, in consideration of the covenants and agreement herein, it is agreed by and between the parties hereto as follows:

## I.

That, Patricia Ettress, second party, covenants and agrees:

1. To transfer, convey and assign all of her right, title and interest in the Class C Liquor License heretofore operated as Barnett's Bar & Lounge, to Alphonse Lewis, Jr., his heirs or assigns;

2. To execute and place in escrow any papers necessary to the completion of this agreement and the transfer and assignment of said Class C Liquor license to Alphonse Lewis, Jr., or his assigns;

3. To sign and deliver to first party at the time this agreement is signed a request for and consent to the Grand Rapids Police Department, the Grand Rapids City Commission and the Michigan Liquor Control Commission requesting their consent to the transfer of said license from second party to first party or his assigns;

4. To execute any and all papers necessary to completely carry out all the terms of this agreement or in lieu thereof said papers shall be signed upon orders of a Judge of the Kent County Circuit Court in case No. 65570;

5. To stipulate and agree to the immediate appointment of Alphonse Lewis, Jr. as a receiver of said license and his appointment as such receiver by order of the Circuit Court for the County of Kent in the case presently pending therein and issuance of the Class C Liquor license to said receiver by the Liquor Control Commission pending approval and transfer of said license to Alphonse Lewis, Jr., his heirs or assigns;

6. To assign all her right, claims and causes of actions against Frederick Poel and/or Rosalind Bolt Larson, their heirs or assigns or the heirs or assigns of Menso R. Bolt, said assignment to include claims and causes of action of any kind or nature;

7. To make the Circuit Court for the County of Kent or the Judges thereof irrevocable attorneys and agents in fact with the power and authority to authorize and decree any act to be done in consummation of this agreement;

8. To transfer to the receiver all alcoholic beverages contained in the inventory submitted to the Liquor Control Commission without costs;

9. To do no act or acts to improperly or unduly interfere with the operation of said business by said receiver or the completion or execution of this agreement;

10. To transfer, assign and convey to first party all rights, claims and causes of actions against Arnold R. Levandoski, his heirs, estate or assigns or the partnership of which he was a part during his lifetime;

11. To release all right, title and interest in any of the personal property heretofore used in the operation of said Barnett's Bar & Lounge and any equity of redemption of the chattel mortgage in said premises on said personal property held or claimed by second party;

12. To cooperate fully with first party for conferences and court appearances, if any be necessary, in connection with any of the claims against second party or in the enforcement of any of the claims second party assigns to first party;

13. To keep first party advised of her whereabouts at all times and not to cooperate with any of her creditors or to do any other act or thing to jeopardize first party's exercise of assignments or claims or defense to any claims or causes of action against second party.

In consideration of the covenants and agreements herein, first party agrees to:

1. To settle, compromise and hold second party entirely harmless from the following debts and obligations provided all of said debts can be settled and compromised for a sum not to exceed $7100.00.

Dr. Cortez English

Taylor O. Hayes

Decker, Davies, Jean and Mackey Insurance Agency

Arthur Kramer or Dorothy Kramer, doing business as Kent Bookkeeping Service

Personal property taxes for the City of Grand Rapids

Personal property taxes for the County of Kent

Michigan Department of Revenue, for taxes, including, but not limited to sales taxes and business activities taxes

United States Internal Revenue Service including but not limited to the 1959, 1960 and 1961 withholding and personal income taxes and 1962 excise taxes;

2. To save second party harmless on all claims and obligations and causes of actions by Frederick W. Poel, Rosalind Bolt Larson and heirs or assigns or the Estate of Menso R. Bolt arising out of the handling or or connected with the handling of, the Estates of Stanley Barnett, Sr., Bessie Barnett, Stanley Barnett, Jr. and/or Patricia Barnett, /arising out of or being a part of a present claim in a suit by Fredeirck W. Poel and Rosalind Bolt Larson in the Kent County Circuit Court against second party.

3. To save second party harmless from all claims and causes of actions by Arnold Levandoski, his heirs, assigns or estate or the law firm with which he was connected at his death;

4. To pay to the law firm of Rom and Newton Dilley the sum of $1700.00 in escrow upon the terms and conditions hereinafter provided to be held by them in trust for the payment of and fees and expenses, the Associates Discount or Loan Corporation and miscellaneous debts of second party;

To pay the sum of $200.00 at the time of execution of said agreement and the sum of $200.00 on August 1, 1962 and the sum of $100.00 Sept. 1, 1962 and the sum of $100.00 on the 1st day of each following month so long as first party is operating the bar as receiver until a total sum of $1700.00 is paid;

It is further understood and agreed that on August 1, 1962 the said law firm of Rom and Newton Dilley may withdraw

from said trust fund and apply to their fees the sum of $400.00 and on September 1, 1962 may withdraw and apply upon their fees the sum of $100.00 and a like sum of $100.00 on the 1st day of each month during the operation of said business by Alphonse Lewis, Jr. as receiver until the sum of $1000.00 has been so applied;

Notwithstanding any of the above terms and conditions, any balance of said $1700 not already paid shall be paid within 10 days after the transfer of said license and may be applied immediately as hereinbefore stated:

5. To act as receiver for the operation of said bar during the pendency of proceedings for the transfer of the license to first party; and hold second party harmless from all obligations in connection therewith;

6. To receive no other compensation as receiver other than the net proceeds from the operation of said business heretofore known as Barnett's Bar & Lounge;

7. To refrain from any attempt to recover or obtain any money or thing of value from second party arising out of the operation of Barnett's Bar & Lounge or any other claim first party may have against second party and to hold second party entirely harmless therefrom and particularly, but not limited to, claims for rent, loans, manager's fees and attorney's fees.

It is further covenanted and agreed between the parties hereto that first party shall dismiss or be responsible for obtaining dismissal of the present suit by first party and Dr. Cortez A. English pending in the Kent County Circuit Court upon the transfer of the Class C Liquor License to first party or his assignees.

It is further covenanted and agreed that the receivership of Alphonse Lewis, Jr., shall be terminated 10 days after final disapproval of the transfer of the Class C Liquor License from second party to first party or his assignees or the final refusal of the United States Internal Revenue Service to compromise and settle its claims against second party in accordance with paragraph (1) above, whichever first occurs. It is further agreed that a successor receiver may be appointed upon the mutual consent of the parties hereto and the proceeds of said business or operation shall be paid to the Clerk of the Court at intervals not to exceed 60 days or as directed by the Kent County Circuit Court in case No. 65570.

It is further understood and agreed that the proceeds over and above the necessary expenses of the successor receivership as approved by the Court shall be held in trust for the following purposes: and order of priority;

(a) For the payment of any unpaid portion of the reasonable attorney fees owed by second party to her attorneys, Rom and Newton Dilley;

(b) For the payment to first party in refund of any sums first party has paid to Rom & Newton Dilley to apply on, or have been applied on their attorney fees under this agreement, this being a reference to the initial and monthly payments payable to Rom & Newton Dilley in escrow as hereinbefore provided;

(c) For the payment to first party in refund of the license fees that he has in fact paid, pro-rated for the unused portion of the license year during which his receivership terminates.

It is further covenanted and agreed that this agreement is not and shall not be considered a third party beneficiary contract or for the benefit of any other person or persons other than the parties

hereto and shall not be enforceable by any other person or persons other than the heirs or assigns of the parties hereto.

It is further stipulated and agreed that this agreement shall be subject to the transfer of the license from second party to first party or his assigns by the Michigan Liquor Control Commission and that

no money shall be paid out in connection with this agreement except as herein provided until the transfer of said license is so approved and transferred to first party.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals this 20 day of March, 1962.

WITNESSES:

(s) Alphonse Lewis, Jr.
_____
Alphonse Lewis, Jr.

(s) Charles N. Dewey
_____

(s) Patricia Ettress
_____
Patricia Ettress

---

## APPENDIX II.

### April 6, 1962

Grand Rapids Police Department
Grand Rapids, Michigan

Attention: Chief of Police

Dear Sir:

Under date of October 13, 1961 we forwarded two (2) forms LC 1800 to cover the transfer of the Class "C" license held in the name of Patricia Ettress to Alphonse Lewis and Dr. C. A. English.

This has been a complex matter which we hope has now been satisfactorily clarified. We understand the violations and tax difficulties have all been resolved.

The 1961 license has been returned to the location where it is being operated under a Power of Attorney issued by the licensee.

It is respectfully requested we be furnished the 1800 forms with whatever recommendation the Police Department intends, in order we may clear up this matter as soon as possible.

We have a copy of notice No. 65570, in which the licensee, Patricia Ettress, requests the local authorities in Grand Rapids to permit the transfer of the license.

May we hear from you at your convenience regarding this matter.

Very truly yours,

MICHIGAN LIQUOR CONTROL COMMISSION

Edward F. Maloney, Director

License Division
EFM:br

## APPENDIX III.

### April 12, 1962

Superintendent of Police
City of Grand Rapids
Grand Rapids, Michigan

Re: Transfer of Liquor License
From
Patricia Ettress
To
Alphonse Lewis, Jr.

It has been brought to the attention of this office that Mr. Alphonse Lewis, Jr., Attorney at Law, Grand Rapids, Michigan has applied for the transfer of the Liquor License held by Patricia Ettress, DBA Barnett Bar, 60 Ionia Ave. S.W., Grand Rapids, Michigan.

For your information, Patricia Ettress is indebted to the Federal Government for past due Federal taxes for which Notices

of Lien have been filed with the Register of Deeds, Kent County, Michigan.

A "Stop Order" has been placed on the transfer of this license with the Michigan Liquor Control Commission asking for their cooperation in holding up any transfer until the Government's obligation is satisfied.

If at all possible, this office would like a similar order be made a part of your file in the matter of the transfer of the license to Mr. Lewis.

Thanking you for your cooperation, in this and past matters I remain,

Sincerely,
R. I. Nixon
District Director
By:
Gordon F. Forell
Revenue Officer